982 P.2d 1156 (1999)
138 Wash.2d 898
In re DETENTION OF A.S.
State of Washington, Respondent,
v.
A.S., Petitioner.
In re the Detention of Christopher McClenahan
State of Washington, Respondent,
v.
Christopher McClenahan, Petitioner.
In re the Mental Health Commitment of Ellen Lucas
State of Washington, Respondent,
v.
Ellen Lucas, Petitioner.
No. 66997-0.
Supreme Court of Washington, En Banc.
Argued March 10, 1999.
Decided September 9, 1999.
*1158 Nielsen, Broman & Assoc., Eric Broman, Seattle, for Petitioner.
K. Garl Long, Skagit County Prosecutor, Erik Pedersen, Deputy, Mount Vernon, for Respondent.
*1157 TALMADGE, J.
Three individuals subject to detention under chapter 71.05 RCW, the involuntary civil commitment act (the Act), challenge the propriety of their 14-day involuntary confinements. Each claims the social worker who testified to the bases for their confinement lacked the qualifications to testify about their alleged mental disorders. Sheldon and Lucas also claim the trial court should have dismissed their petitions because the statutorily required signatories had not signed them.
We hold, under the unique circumstances of the Sheldon and Lucas petitions, the statutory signature requirements for the 14-day confinement petition were met because a physician, as promised in the petition, provided an affidavit in support of each petition before the confinement hearing in lieu of her signature on the petition. We further hold a social worker is not disqualified as a matter of law from rendering an opinion as to the presence of a mental disorder in a person subject to a 14-day confinement, provided the social worker otherwise qualifies as an expert and the opinion meets the requirements of ER 702 and 703. We affirm the decision of the Court of Appeals sustaining all three 14-day confinements.

ISSUES
1. Should the trial court have dismissed the Lucas and Sheldon petitions because of the lack of a physician's signature?
2. Was a social worker's opinion as to whether the three individuals suffered from a mental disorder admissible?

FACTS
A. INVOLUNTARY CONFINEMENT OF ARNOLD SHELDON (A.S.)
On March 11, 1997, the San Juan County Designated Mental Health Professional (CDMHP),[1] Robert LeBeau, sought emergency detention for Arnold Sheldon. The CDMHP's Notice of Emergency Detention stated:
Mr. Sheldon is an 86 year old Caucasian male who was evaluated for involuntary mental health treatment at the request of Charles Silverman, the San Juan County Prosecuting Attorney. Mr. Sheldon has been arrested 14 times in the last 4 months for a variety of charges. These charges were filed after he sent numerous sexually suggestive notes to a next door neighbor and has gone repeatedly to a local paper, The Journal of the San Juans, telling the staff that he now owned the paper and that they needed to leave. Mr. Silverman also reports that Joan Sheldon, the respondent's wife, has stated to him that Mr. Sheldon has been violent toward her and has threatened to kill her. [Sentence deleted in original]. I did, however, consult with Elizabeth Forsman, who has received numerous letters from Mr. Sheldon, and Dr. Jack Crawford, who had evaluated Mr. Sheldon's competence to stand trial. I also interviewed Mr. Sheldon.
Mr. Sheldon presented as disheveled and somewhat dirty. He appeared to have feces on his pants. He was generally cooperative with the interview and was oriented to person, place and time. He denied threatening his wife but he did state that she had lied about him in court in order to become his guardian. He did not deny that he had written sexually suggestive *1159 notes to Ms. Forsman and stated that he had been sending them to another neighbor as well. He reported that he had done this because "those women are loaded with estrogenit makes them do crazy things." He acknowledged that he had been court ordered to stop writing those letters but that he had not because 1) the women involved had not asked him directly to stop; and 2) "because they're making such fools of themselves." In consulting with Ms. Forsman, she reports that she is very afraid of Mr. Sheldon, that his notes contain threats to rape her, and that she has had the locks changed in her house out of fear of being harmed by Mr. Sheldon.
During the interview Mr. Sheldon repeated that he owned the Journal of the San Juans, having purchased the paper for $1.00 last December. He felt that the charges against him for harassment, telephone harassment and criminal trespassing were unwarranted as he owns the paper.
Mrs. Joan Sheldon was also contacted as a part of this evaluation.... She reports that Mr. Sheldon has become increasingly erratic in his thinking and his behavior. He has told friends in town that he is going to kill her. She also reports that he frequently leaves burners on with their stove and that she is concerned he will burn himself and/or their home.
Dr. Crawford reports that Mr. Sheldon is delusional, a danger to himself and is not competent to stand trial.
Based on these facts, Mr. Sheldon was detained as a danger to self, others, and gravely disabled.
Clerk's Papers (Sheldon) at 1-2. LeBeau filed the Notice of Emergency Detention pursuant to RCW 71.05.150(1)(a), which authorizes a CDMHP to file a petition for initial detention when a person with a mental disorder presents a likelihood of serious harm or is gravely disabled.
Sheldon was briefly hospitalized for a nonpsychiatric medical condition pursuant to RCW 71.05.210, and three days later, on Friday, March 14, 1997, a mental health professional for Skagit County filed a petition for 14 additional days of confinement for Sheldon pursuant to RCW 71.05.230, alleging much the same conduct as the Notice of Emergency Detention. The petition was signed only by Bruce Work, MSW, as the petitioner. In the space designated for the signature of a physician, Work wrote, "In expectation of psychiatrist's affidavit." Clerk's Papers at 6-8. In the petition, Work alleged the following:
Respondent was detained following a series of incidents and arrests over a several month period that indicated a potential danger to others and a loss of cognitive and volitional control. His wife states that she has moved out due to his threatening behavior, but he is not able to care for himself (leaves burners on, def[e]cates in strange places, unable to manage money). When interviewed, Respondent acknowledges his bizarre and antisocial behavior, but insists it is appropriate and normal. Respondent suffers from a mental disorder that causes him to be gravely disabled. No less restrictive options.
Clerk's Papers at 6-7.
On Monday, March 17, 1997, at the beginning of the 14-day confinement hearing before Skagit County Court Commissioner Dave Needy, acting as a judge pro tempore of the Skagit County Superior Court, the State introduced the affidavit of Dr. Kathryn Neracs, a psychiatrist on the staff of the treatment facility in which Sheldon was confined.[2] Dr. Neracs' evaluation averred:
I am a psychiatrist at North Sound E & T [Evaluation & Treatment], and have evaluated Mr. Arnold Sheldon today, 3-14-97. He was admitted to NSd E & T on 3-12-97. He was detained as GD, DTO, DTS. He was detained following a series of incidents and arrests over a several month period, with bizarre and threatening behavior. The first day at NSD Mr. Sheldon developed a high fever, and was transferred to Skagit Valley Hosp., where he was treated for urosepsis (infection of the *1160 urine and blood). He was transferred back to NSD today. Mr. Sheldon appears to have mild dementia, and significant delusions. He believes he has inner vision that is never wrong. He denies health problems, although this is clearly not true. I believe he needs further hospitalization to clarify his psychiatric diagnosis, and stabilize him physically and psychologically. He has not yet been treated with any psychiatric medications because of his poor physical health.
Clerk's Papers at 9. The State provided Sheldon's counsel a copy of Dr. Neracs' affidavit just before the hearing.
During the hearing, Sheldon's wife and Work testified for the State in support of the petition for 14-day involuntary treatment. Work, a CDMHP in Grays Harbor County and Thurston County, gave as his qualifications a master's degree in social work with a psychiatric specialty. In answer to the question of what information he had reviewed in his evaluation of Sheldon, Work answered he had reviewed Sheldon's chart and had spoken with Dr. Gaither, Mrs. Sheldon, and Robert LeBeau. Sheldon objected when the State asked Work for his opinion of whether Sheldon suffered from a mental disorder. Sheldon never stated the basis for the objection, but the State has treated the objection as one going to Work's qualifications to give an opinion on the subject of mental disorder. The trial court denied the objection.
Sheldon made the following statement after all other witnesses had testified.
I am Arnold Sheldon, U.S. citizen, blind,[[3]] and 87 years old. I should not be here. When I get home to Friday Harbor the first act I do is to have a man arrested. Within hours of that I shall start a paper I was about to start when I left. The name of the paper is the Friday Harbor Journal. It doesn't exist at this moment, but it will when I get there. And the entire account of this adventure from 2:30 in the afternoon on April 11th to the present will be written up, and out of it will come maybe one or more lawsuits. That's all. Thank you.
Report of Proceedings (Sheldon) at 27. At the end of the hearing, the trial court ordered Sheldon detained for 14 further days of involuntary treatment.
B. INVOLUNTARY COMMITMENT OF CHRISTOPHER McCLENAHAN
On March 20, 1997, Christopher McClenahan, a 23-year-old resident of Lynnwood, Snohomish County, was taken into detention pursuant to a Notice of Emergency Detention. McClenahan had returned to his mother's Lynnwood house after extensive travel, appearing disheveled, having lost all of his clothing during his journeys. At his mother's home, McClenahan engaged in imaginary conversations and advised his mother that people were out to get him, monitoring him via satellites and radio waves. McClenahan's mother finally locked him out of her house until he agreed to take his medications. In response, McClenahan stood outside in the rain for hours and finally climbed onto the roof of his mother's house, where he began running around, striking the skylight, and screaming. McClenahan's mother phoned the local police. The 14-day detention petition alleged:
Respondent was detained due to increasingly bizarre behavior, some of which put his health and safety at risk. Since his admission to N.S. E & T [North Sound Evaluation and Treatment] he has continued to exhibit symptoms of psychosisdelusional ideation, tangential and pressured speech, markedly impaired insight. He has no clear and reasonable plans for self care if discharged. Respondent is gravely disabled due to a mental disorder, and there are no less restrictive options at this time.
Clerk's Papers at 4-5. The petition was signed by Bruce Work and Dr. Dennis Gaither.
The probable cause hearing took place on March 21, 1997. Work testified he had reviewed *1161 McClenahan's chart, spoken with staff and with Dr. Gaither, met with McClenahan, spoken with McClenahan's mother, and spoken with a friend of McClenahan's. Over McClenahan's objection, Work opined McClenahan suffered from a mental disorder called psychotic disorder, NOS (Not Otherwise Specified). McClenahan testified on his own behalf and claimed he was on the roof effecting roof repairs. The trial court found McClenahan to be suffering from a mental disorder and also to be gravely disabled. The trial court ordered the 14-day commitment.
C. INVOLUNTARY COMMITMENT OF ELLEN LUCAS
An Oak Harbor police officer requested a mental health evaluation of Ellen Lucas after her roommates reported to the police officer Lucas had voiced suicidal intentions. The Island County CDMHP evaluated Lucas and reported in the Notice of Emergency Detention:
I began by informing the respondent of her rights. She spoke to me for about two minutes (during which time she asked me for the definition of a pathological liar) and then stated she did not want to talk any longer. She sat rigidly, staring blankly and refusing to talk. She then stood up, opened a drawer, took out a large knife, and walked back to her room. I alerted the officer (standing outside) who, along with respondent's roommates, wrestled the knife away from the respondent. The respondent [missing text] but instead of going to police station, respondent went home.
Based on the respondent's unwillingness to comply with a less restrictive alternative, her past history of psychotic symptoms, her current presentation and her dangerous behavior (grabbing the large knife and running to her room), this writer is detaining her to N. Sound E & T as danger to self.
Clerk's Papers 1-2. Two days into Lucas's detention, on March 14, 1997, Bruce Work completed a 14-day confinement petition concerning Lucas. He signed it as the petitioner, and indicated in the physician's signature space, as he had with Sheldon's petition of the same day, "in expectation of psychiatrist's affidavit." Clerk's Papers at 6-8. In the petition, Work detailed the following facts:
Respondent was detained after making suicidal statements and attempting to cut or stab herself with a knife. Since admission to the E & T she has continued to appear quite depressed. Her statements are focused on feelings of hopelessness, helplessness, and self-deprecation. She has great difficulty staying on track and focusing on the present, and has no clear plans for discharge. She reports suicide ideation and anger at friends for taking knife from her. Respondent suffers from a mental disorder which causes her to be a danger to herself. There are no less restrictive alternatives.
Clerk's Papers at 6-7.
Lucas's probable cause hearing occurred immediately after Sheldon's hearing on Monday, March 17, 1997. As in Sheldon's case, Dr. Kathryn Neracs filed an affidavit on the day of the hearing after having met with Lucas and completed the affidavit on the preceding Friday. She did not evaluate Lucas and complete her affidavit until after the State had filed the petition. Dr. Neracs averred:
I am a psychiatrist at North Sound E & T. I have evaluated Ellen Lucas today, 3/14/97. Ms. Lucas was detained as DTS [danger to self] after making suicidal statements and attempting to cut or stab herself with a knife. Prozac was started for her depression, however this takes time to work. She remains very depressed. She is tearful, speaks very slowly, and has trouble staying on track with her thoughts. She continues to have suicide ideation. I believe she needs longer hospitalization for further stabilization of her symptoms.
Clerk's Papers at 15.
During the hearing, a psychiatric counselor from North Sound E & T Facility testified Lucas, in custody, had tried to cut her wrist with a comb by sawing away until all the teeth of the comb had broken off. Work testified, over Sheldon's objection as to his *1162 qualifications, that Lucas suffered from a mental disorder, Psychotic Disorder NOS. He urged her detention for 14 days for further treatment. Lucas presented no witnesses and conceded she suffered from a mental disorder. ("We have not put on any testimony and would concede there is a mental disorder."). Id. at 14. She argued she was not a substantial risk to herself because the only recent dangerous act she had engaged in, sawing her arm with a comb, did not produce any blood. The trial court ordered the 14-day additional treatment, finding because of her suicidal ideation and attempting to cut herself with the comb, Lucas presented the likelihood of serious harm to herself.
All three individuals sought review of their 14-day confinement orders by the Court of Appeals. That court consolidated the appeals and held the appeals were not moot, the absence of two signatures on the 14-day confinement petitions in the cases of Sheldon and Lucas was not fatal under the particular circumstances of those cases, and a social worker was not disqualified as a matter of law from testifying at a 14-day commitment hearing to the existence of a patient's mental disorder. In re Detention of A.S., 91 Wash. App. 146, 955 P.2d 836 (1998) (affirming confinement orders). The three individuals petitioned for review of that decision, which we granted.

ANALYSIS
A. COMMITMENTS UNDER CHAPTER 71.05 RCW
Before addressing the specific issues in this case, it is useful to consider the provisions of Washington's Act to place those issues in appropriate context. In 1973, the Legislature enacted the Act to provide specific procedural protections for mentally ill persons subject to involuntary mental treatment. RCW 71.05.030 ("Persons suffering from a mental disorder may not be involuntarily committed for treatment of such disorder except pursuant to provisions of this chapter[.]") (Laws of 1973, 1st Ex.Sess., ch. 142, § 8). Two of the intentions of the Legislature were to end "inappropriate, indefinite commitment of mentally disordered persons" and to "safeguard individual rights[.]" RCW 71.05.010(1), (3). The Act permits the emergency detention of persons for a 72-hour period upon the filing of a Notice of Emergency Detention by a county designated mental health professional. RCW 71.05.150. RCW 71.05.160 requires:
If a person is involuntarily placed in an evaluation and treatment facility pursuant to RCW 71.05.150, on the next judicial day following the initial detention, the county designated mental health professional shall file with the court and serve the designated attorney of the detained person the petition or supplemental petition for initial detention, proof of service of notice, and a copy of a notice of emergency detention.
If the State wants to hold a person beyond this initial period, it must file a petition in superior court:
The professional staff of the agency or facility or the county designated mental health professional has filed a petition for fourteen day involuntary detention or a ninety day less restrictive alternative with the court. The petition must be signed either by two physicians or by one physician and a mental health professional who have examined the person. If involuntary detention is sought the petition shall state facts that support the finding that such person, as a result of mental disorder, presents a likelihood of serious harm, or is gravely disabled and that there are no less restrictive alternatives to detention in the best interest of such person or others. The petition shall state specifically that less restrictive alternative treatment was considered and specify why treatment less restrictive than detention is not appropriate. If an involuntary less restrictive alternative is sought, the petition shall state facts that support the finding that such person, as a result of mental disorder, presents a likelihood of serious harm, or is gravely disabled and shall set forth the less restrictive alternative proposed by the facility[.]
RCW 71.05.230(4). A hearing must then be held at which the State bears the burden of proving by a preponderance of the evidence *1163 the statutory grounds for commitment. The individual subject to detention has the right to counsel at such hearing and may compel the attendance of witnesses. RCW 71.05.200, .250. The court may order 14 more days of confinement or 90 days of less restrictive mandatory treatment at the conclusion of such a hearing:
At the conclusion of the probable cause hearing, if the court finds by a preponderance of the evidence that such person, as the result of mental disorder, presents a likelihood of serious harm, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed fourteen days in a facility certified to provide treatment by the department.
RCW 71.05.240. Should the State seek additional commitment of the individual, the burden escalates to proof by clear, cogent, and convincing evidence and the person has the right to a jury trial. RCW 71.05.310, .320. Also, when the State petitions for a 90-day commitment, the court, if requested, shall appoint a "licensed physician, psychologist, or psychiatrist, designated by the detained person to examine and testify on behalf of the detained person." RCW 71.05.300. Thus, a person subject to commitment receives ever-increasing procedural rights as the commitment duration lengthens.
In 1979, the Legislature amended the Act to allow for involuntary treatment of persons who were "gravely disabled," persons who are in danger of serious physical harm resulting from a failure to provide for essential human health or safety needs as a result of a mental disorder. RCW 71.05.020(1), enacted by Laws of 1973, 1st Ex.Sess., ch. 142, § 7. See In re Detention of LaBelle, 107 Wash.2d 196, 728 P.2d 138 (1986) (upholding constitutionality of "gravely disabled" statute).
We have previously indicated the appropriate interpretative principles to be employed in reviewing the Act:
where as here a significant deprivation of liberty is involved, statutes must be construed strictly. In re Cross, 99 Wash.2d 373, 379, 662 P.2d 828 (1983). On the other hand, our primary objective in interpreting a statute is to ascertain and give effect to the intent of the Legislature. State v. Keller, 98 Wash.2d 725, 728, 657 P.2d 1384 (1983). In so doing, the spirit and intent of the law should prevail over the letter of the law. In re R., 97 Wash.2d 182, 187, 641 P.2d 704 (1982). Furthermore, we will construe a statute so as to avoid strained or absurd consequences which could result from a literal reading. State v. Keller, supra.

LaBelle, 107 Wash.2d at 205, 728 P.2d 138.
In the present case, we note none of the three individuals sought to compel the attendance of Drs. Gaither or Neracs at their 14-day confinement hearing. Nor did any of them present testimony from their own mental health professionals. We now turn to the two issues present in this case.
B. THE VALIDITY OF THE PETITIONS
Sheldon and Lucas assert the petitions for 14-day involuntary treatment the State filed were invalid and should have been dismissed because they were not signed by a physician. RCW 71.05.230(4) provides in pertinent part: "The petition must be signed either by two physicians or by one physician and a mental health professional who have examined the person." The regular staff psychiatrist at North Sound E & T where Sheldon and Lucas were detained, Dr. Gaither, who had earlier examined them, was ill and not present to sign the petitions on the day the State filed them. Bruce Work, who did sign both petitions, indicated in the signature block for the physician an affidavit from a psychiatrist would follow. At the probable cause hearing, the State offered the affidavits of Dr. Neracs as a substitute for the signature of the psychiatrist on the petition. Dr. Neracs averred in her affidavits there was justification for the detention and involuntary treatment of both Sheldon and Lucas.
Sheldon and Lucas now argue the involuntary commitment statute must be strictly construed, correctly citing LaBelle, 107 *1164 Wash.2d at 205, 728 P.2d 138 (holding statutory criteria for finding person "gravely disabled" not unconstitutionally vague). Strict construction, they maintain, must result in dismissal of the petitions if they are not signed by either two physicians or by one mental health professional and one physician, pursuant to the statute.
The Court of Appeals disagreed. It held the failure to obtain the physician's signature on the petitions was not fatal because the physician's affidavits attesting to the need for additional treatment were available to the trial court at the time of the probable cause hearings. As a result, the statutory requirement for two qualified persons to attest to the need for a hearing regarding further treatment was fulfilled. Essentially, although the Court of Appeals did not use the term, there was substantial compliance here with the legislative intent. Detention of A.S., 91 Wash.App. at 158-59, 955 P.2d 836.
The Court of Appeals was correct. The Legislature listed in RCW 71.05.010 the following items as part of its intent in enacting chapter 71.05 RCW:
(1) To prevent inappropriate, indefinite commitment of mentally disordered persons and to eliminate legal disabilities that arise from such commitment;
(2) To provide prompt evaluation and timely and appropriate treatment of persons with serious mental disorders;
(3) To safeguard individual rights;
(4) To provide continuity of care for persons with serious mental disorders;
(5) To encourage the full use of all existing agencies, professional personnel, and public funds to prevent duplication of services and unnecessary expenditures; ...
The intent of the Act is implemented by allowing these petitions to proceed. The circumstances here were unique. First, Sheldon and Lucas unquestionably were troubled and mentally disordered; there is no question here about callous or oppressive mental health officials locking people up for specious reasons in the guise of treatment. Second, the absence of a physician's signature on the petitions was not the result of oppression, carelessness, or attempted circumvention of the statutory procedural requirements, but rather resulted from the illness of the physician who performed Sheldon's and Lucas's intake evaluations, Dr. Gaither, who, because of his illness, was not available to sign the petitions. To make up for Dr. Gaither's absence, another physician, Dr. Neracs, was summoned from Seattle to evaluate Sheldon and Lucas and provide support for the 14-day confinement petitions. Because she was summoned on short notice, Dr. Neracs was not able to complete the evaluations and sign the petitions before they were filed, so she provided affidavits as substitutes.
Third, even if the petitions were improper, the petitions would only have been dismissed without prejudice. In re Detention of J.R., 80 Wash.App. 947, 953-54, 912 P.2d 1062, review denied, 130 Wash.2d 1003, 925 P.2d 989 (1996). At the time the individuals raised the issue, the State had sufficient time under the statute to file corrected petitions and new probable cause hearings could have been held. No prejudice to the individuals occurred here, as counsel conceded in oral argument.[4]See In re Detention of G.V., 124 Wash.2d 288, 877 P.2d 680 (1994) (abuse of discretion to deny State one day continuance to advise patients of right to refuse medications where recommitment hearings could be timely held despite continuance).
Finally, Sheldon's and Lucas's rights were not compromised in these cases. Their detention was commenced by the filing of the notice of emergency detention, about which they do not complain, not the filing of the 14-day confinement petition. The additional 14-day confinement came about only after their probable cause hearings and the trial court's orders detaining them for 14 days of involuntary treatment. Thus, the lack of signatures on their petitions did not cause an "inappropriate" commitment. Nor were they deprived of due process; they had both notice and an opportunity to be heard, the cornerstones of due process.[5] Their objections are *1165 formal, not substantive, and should be rejected. See Crosby v. County of Spokane, 137 Wash.2d 296, 971 P.2d 32 (1999) (substantial compliance with legislative intent surmounts even jurisdictional hurdle).[6]
C. ADMISSIBILITY OF SOCIAL WORKER'S OPINION TESTIMONY
All three individuals argue Bruce Work was not qualified to opine they suffered from a mental disorder, meaning "any organic, mental, or emotional impairment which has substantial adverse effects on an individual's cognitive or volitional functions[.]" RCW 71.05.020(15). In the DSHS regulation, "`Mental disorder' means any organic, mental, or emotional impairment having substantial adverse effects on an individual's cognitive or volitional functions, classified in accordance with the current diagnostic and statistical manual of the American psychiatric association." WAC 275-55-020(17).
They also assert only physicians and psychiatrists are qualified to diagnose mental disorders. They do not offer the opinion of a physician or psychiatrist to support their contention. Nor do they point to a statute or regulation stating as much. They argue expert opinion testimony concerning a person's mental status is not admissible unless the expert holds his or her opinion with reasonable medical or psychological certainty. In re Detention of Twining, 77 Wash.App. 882, 891, 894 P.2d 1331, review denied, 127 Wash.2d 1018, 904 P.2d 299 (1995). Because Work is neither a medical doctor nor a psychologist, they contend, he cannot possibly hold any opinion with a reasonable degree of medical or psychological certainty.[7]
The individuals also make a statutory argument. They note the Legislature enacted licensure for social workers, mental health counselors, and marriage and family therapists in 1987, Laws of 1987, ch. 512, but later amended the statutes pertaining to the latter two categories of professional specifically to authorize them to diagnose mental disorders. Laws of 1995, ch. 183, § 1; Laws of 1993, ch. 259, § 1.[8] Because the Legislature *1166 did not amend the scope of practice for social workers to include diagnosing mental disorders, the individuals assert the negative inference must mean the Legislature considers such diagnoses beyond the scope of social worker practice. We treat each argument in turn.
Our analysis of the admissibility of expert opinion evidence begins with ER 702 and 703. ER 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Similarly, ER 703 states:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
Moreover, the long-standing rule in Washington is, "Qualifications of expert witnesses are to be determined by the trial court within its sound discretion, and rulings on such matters will not be disturbed unless there is a manifest abuse of discretion." Oliver v. Pacific Northwest Bell Tel. Co., 106 Wash.2d 675, 683, 724 P.2d 1003 (1986).
Initially, there is nothing in the professional licensure statute for social workers that bars a social worker from giving an opinion on the existence of a mental disorder. Indeed, RCW 18.19.110(3) provides: "Certified social work practice ... includes, but is not limited to, evaluation, assessment, treatment of psychopathology, consultation, psychotherapy and counseling ... directed toward client services." (Emphasis added.) The rendering of an opinion on the existence of a mental disorder was clearly within this statutory description of social worker's scope of practice. The Legislature did not need to amend the social worker scope of practice as originally enacted in 1987 because it plainly allowed social workers to diagnose mental disorders.
Moreover, there is nothing in chapter 71.05 RCW itself that bars a social worker from testifying to the presence of a mental disorder. To the contrary, RCW 71.05.020(16) states: "`Mental health professional' means a psychiatrist, psychologist, psychiatric *1167 nurse, or social worker, and such other mental health professionals as may be defined by rules adopted by the secretary [of the Department of Social and Health Services] pursuant to the provisions of this chapter[.]" A social worker who is trained as a mental health professional is entitled to serve as a CDMHP who may detain individuals on an emergency basis, RCW 71.05.150, and to sign a petition for a 14-day confinement. RCW 71.05.230. It would be entirely anomalous for the Legislature to authorize a person to detain an individual for a mental disorder and sign the petition for that individual's lengthier commitment, but then bar that person because of a lack of qualifications from testifying at a hearing concerning the detained individual's mental disorder.
Finally, any reliance on Twining, a case involving the commitment of sexually violent predators, is misplaced. A social worker is not obliged to testify to a reasonable medical or psychological certainty as to a mental disorder, but only to reasonable professional certainty. As the Court of Appeals persuasively noted, "[petitioners] misconstrue this standard, which does not measure the expert's qualifications, but rather the correlation between the facts and the expert's opinion." Detention of A.S., 91 Wash.App. at 160, 955 P.2d 836. We decline to hold a social worker is categorically barred from testifying to the existence of a mental disorder.
This view is consistent with the law in other jurisdictions. In New York, "Properly trained clinical social workers are manifestly competent to diagnose mental disorders." People v. Scala, 128 Misc.2d 831, 491 N.Y.S.2d 555, 560 (Sup.Ct.1985). As a New York Supreme Court explained:
With regard to the question of whether or not a non-medical mental health professional may diagnose mental disorders and provide an expert opinion as to that diagnosis, I note that clinical social work, as a profession, is one of the core mental health disciplines. As are psychiatrists and clinical psychologists, clinical social workers are skilled in the diagnosis and treatment of mental disorders. Psychiatrists, who are physicians, bring their expertise in the understanding of organic pathology, psychopharmacology and other somatic treatments to the mental health field. Clinical psychologists, being scientists who study human behavior as well as being non-medical mental health professionals, bring their particular skills in research and in the study of behavior to the mental health field. It can be noted that clinical social workers, also non-medical mental health professionals, bring their expertise in dealing with the relationship between social and emotional functioning as well as their expertise in social policy and in environmental intervention to the mental health field.
The Diagnostic and Statistical Manual of Mental DisordersThird Edition (DSM III) represents the current guide for the diagnosis of mental disorders in the United States. The diagnostic criteria set forth in the DSM III were validated during field trials. These field trials were carried out by professionals from the disciplines of Psychiatry, Psychology, Clinical Social Work and Psychiatric Nursing. Besides psychiatrists, psychologists and clinical social workers served on several of the advisory committees which developed this diagnostic guide and served as consultants to the task force which compiled it. This court is informed that a social worker, Janet Williams, M.S.W., served as Co-principal Investigator and Project Coordinator for the reliability study and field trials of the DSM III. Further, throughout the DSM III references are made to its utilization by "clinicians", not exclusively by psychiatrists. It is clear, that if one is to accept the DSM III as a valid and reliable guide, then one must accept that properly trained psychiatrists, psychologists, clinical social workers and psychiatric nurses are qualified to apply its diagnostic criteria in their diagnostic assessment of patients. I find no merit in any arguments that the application and use of the DSM III diagnoses should be limited to physicians and psychiatrists.
This court holds that even though they are not physicians, certified social workers who demonstrate appropriate training and supervised clinical experience *1168 in the diagnostic assessment of mental disorders may, within the scope of their license, make diagnostic assessments of a person's mental condition and may qualify as experts in the diagnosis of mental disorders.
People v. Gans, 119 Misc.2d 843, 465 N.Y.S.2d 147, 148-49 (Sup.Ct.1983).
The petitioners cite three cases in their supplemental brief for the proposition, "Courts in other jurisdictions likewise agree that a social worker is unqualified to give a `medical diagnosis.'" Supplemental Br. of Pet'rs at 10. This statement is incorrect; the cases cited do not come close to standing for that proposition. For instance, the petitioners say People v. Skowronski, 61 Mich. App. 71, 232 N.W.2d 306 (1975), speaks to "Michigan's well-established rule that social workers are unqualified to testify as an expert to evaluate competency." Supplemental Br. of Pet'rs at 12-13. What that case actually says is this:
The trial court erred in allowing a social worker to testify as an expert to evaluate competency. The forensic center had administered several psychological tests and reported there was no evidence of organic brain damage. However, the only witness provided at the competency hearing by the forensic center was a social worker who admitted she was not qualified to administer or evaluate those tests.
Skowronski, 232 N.W.2d at 310. This is a far cry from the petitioners' assertion that social workers are unqualified to give a medical diagnosis. Similarly, petitioners cite United States v. Moses, 137 F.3d 894 (6th Cir.1998), for the proposition "the social worker did not qualify as an expert for purposes of rendering a psychological or psychiatric opinion under the Act." Supplemental Br. of Pet'rs at 11. That is not what the case held. The issue in Moses was whether the social worker could testify as to the trauma a child abuse victim would undergo by testifying in open court. The Court of Appeals reversed the trial court's admission of a social worker's testimony about trauma not because social workers are generally unqualified to give such opinions, but because the particular social worker in that case did not have "any `special skill or knowledge' generally relating to trauma." In addition, the social worker had testified in court only twice before, and only once in a case involving child sexual abuse. Moses, 137 F.3d at 900. The court made no general statement disqualifying social workers from giving trauma testimony; indeed, the negative implication of the court's opinion is a properly qualified and experienced social worker could have given such testimony. Finally, petitioners cite Vallinoto v. DiSandro, 688 A.2d 830 (R.I.1997), in which the court held a social worker could not testify a client suffered from posttraumatic stress disorder, as that disorder could be diagnosed only by medical experts. Vallinoto announced no general rule forbidding social workers from testifying about mental disorders. It merely said posttraumatic stress disorder is a medical condition and the social worker did not present any qualifications for making such a diagnosis. There is no showing here that the statutorily defined term, "mental disorder," is a medical condition only a physician can diagnose.
In the present case, applying the principles of ER 702 and 703, the trial court did not abuse its discretion in finding Work qualified as an expert and in admitting his opinion on the mental disorders of Sheldon, McClenahan, and Lucas. Work met the statutory definition of a social worker. "`Social worker' means a person with a master's or further advanced degree from an accredited school of social work or a degree deemed equivalent under rules adopted by the secretary[.]" RCW 71.05.020(25). He was licensed under chapter 18.19 RCW as well. Work was the CDMHP for Thurston and Grays Harbor Counties. He had performed thousands of mental health evaluations. Work appropriately qualified as an expert.
As to the three individuals here, Work testified that in preparation for his testimony at both the Sheldon and the McClenahan probable cause hearings he reviewed the charts, spoke with Dr. Gaither, spoke with the staff, spoke with Sheldon's wife by phone, interviewed both Sheldon and McClenahan, and spoke with the detaining mental health professionals. The chart Work relied upon contained Dr. Gaither's "fairly long assessment" of Sheldon, which *1169 Dr. Gaither prepared upon Sheldon's initial confinement on March 12, 1997. Work was qualified as a mental health professional, and he relied in part on his opinion of the diagnosis of a psychiatrist, Dr. Gaither. His testimony was therefore admissible under ER 703.
In summary, social workers in their statutorily defined roles as mental health professionals and CDMHPs occupy central positions in the care and treatment of those subject to involuntary commitment for mental disorders. They are one of two permitted signatories to the 14-day petition for involuntary treatment. The Legislature plainly contemplated they would be qualified to testify about their reasons for signing the petition. The statute defining certified social workers includes psychopathology and psychotherapy within a social worker's scope of practice. In the absence of legislative direction limiting a social worker's scope of practice, or defining "mental disorder" under chapter 71.05 RCW as a condition only a physician may diagnose, we decline to formulate a categorical evidentiary rule. Rather, we continue to allow trial courts to exercise their sound discretion as to a social worker's qualifications to opine about mental disorders.[9]

CONCLUSION[10]
The 14-day confinement petitions for Sheldon and Lucas, though lacking a second signature, were sufficient under these unique circumstances insofar as a physician submitted an affidavit in support of the petition at the time of the hearing. These individuals were not prejudiced by the absence of a physician's signature.
Moreover, in the absence of expert testimony that determination of a mental disorder is beyond the scope of a social worker's practice under chapter 18.19 RCW or a legislative declaration in chapter 71.05 RCW that only physicians may offer expert testimony as to the existence of a mental disorder, we decline to make a categorical rule that a social worker, no matter how qualified by training and experience, may never opine about a person's mental disorder. We instead uphold the usual rule that admission of expert testimony is within the sound discretion of the trial court, governed by ER 702 and 703, and will be overturned only for manifest abuse of discretion. The trial court did not abuse its discretion in these cases by allowing Bruce Work to testify. We affirm the Court of Appeals and the trial court's 14-day confinement orders.
GUY, C.J., DURHAM, SMITH and IRELAND, JJ., concur.
MADSEN, J. (dissenting).
In this case involving the liberty interest of individuals with "mental disorder[s],"[1] the majority holds that a social worker's signature and the mere promise of a physician's later affidavit in support of a petition for the 14-day involuntary commitment of a person constitutes substantial compliance with RCW 71.05.230(4). The statute, however, specifically provides that "[t]he petition must be signed either by two physicians or by one physician and a mental health professional who have examined the person." RCW 71.05.230(4) (emphasis added). The majority ignores the statute's mandatory language and the well-established and often repeated rule of strict construction applied to *1170 civil commitment statutes. Instead, the majority finds some implied exception to the requirements in RCW 71.05.230(4) where "unique circumstances" are presented.[2] In such circumstances, the majority believes that substantial compliance rather than strict compliance with the statute's mandatory language is justified. Relying on one case, wholly unrelated to mental health commitment, the majority creates an unwarranted exception to a statute that is intended to prevent inappropriate detention and safeguard the liberty rights of the mentally disordered. RCW 71.05.010. Additionally, the majority holds that a social worker's testimony alone is sufficient expert testimony of a detainee's mental condition to justify further commitment. I must respectfully dissent.
RCW 71.05.230(4)'s Signature Requirement
RCW 71.05 sets forth procedures for detaining a person involuntarily for an additional 14 days following an initial 72-hour emergency detention. RCW 71.05.230 contains detailed provisions for petitioning for additional treatment. The statute provides:
A person detained for seventy-two hour evaluation and treatment may be detained for not more than fourteen additional days of involuntary intensive treatment or ninety additional days of a less restrictive alternative to involuntary intensive treatment if the following conditions are met:
(1) The professional staff of the agency or facility providing evaluation services has analyzed the person's condition and finds that the condition is caused by mental disorder and either results in a likelihood of serious harm, or results in the detained person being gravely disabled and are prepared to testify those conditions are met; and
(2) The person has been advised of the need for voluntary treatment and the professional staff of the facility has evidence that he or she has not in good faith volunteered; and
(3) The facility providing intensive treatment is certified to provide such treatment by the department; and
(4) The professional staff of the agency or facility or the county designated mental health professional has filed a petition for fourteen day involuntary detention or a ninety day less restrictive alternative with the court. The petition must be signed either by two physicians or by one physician and a mental health professional who have examined the person. If involuntary detention is sought the petition shall state facts that support the finding that such person, as a result of mental disorder, presents a likelihood of serious harm, or is gravely disabled and that there are no less restrictive alternatives to detention in the best interest of such person or others. The petition shall state specifically that less restrictive alternative treatment was considered and specify why treatment less restrictive than detention is not appropriate. If an involuntary less restrictive alternative is sought, the petition shall state facts that support the finding that such person, as a result of mental disorder, presents a likelihood of serious harm, or is gravely disabled and shall set forth the less restrictive alternative proposed by the facility; and
(5) A copy of the petition has been served on the detained person, his or her attorney and his or her guardian or conservator, if any, prior to the probable cause hearing; and
(6) The court at the time the petition was filed and before the probable cause hearing has appointed counsel to represent such person if no other counsel has appeared; and
(7) The court has ordered a fourteen day involuntary intensive treatment or a ninety day less restrictive alternative treatment after a probable cause hearing has been held pursuant to RCW 71.05.240; and
(8) At the conclusion of the initial commitment period, the professional staff of the agency or facility or the county designated mental health professional may petition for an additional period of either ninety *1171 days of less restrictive alternative treatment or ninety days of involuntary intensive treatment as provided in RCW 71.05.290; and
(9) If the hospital or facility designated to provide outpatient treatment is other than the facility providing involuntary treatment, the outpatient facility so designated has agreed to assume such responsibility.
RCW 71.05.230 (emphasis added).
The statute guarantees that a person subject to additional confinement will undergo proper examination, evaluation, and treatment with a qualified agency or treatment facility in the event a petition is filed. The statutory procedures also assure that the detainee receives due process. Even before a petition is filed, the detainee must be advised of the need for treatment. RCW 71.05.230(2). Should the detainee be unwilling to undergo treatment voluntarily, the detainee is entitled to a copy of the petition prior to the probable cause hearing and legal representation at the hearing. RCW 71.05.230(5), (6). A petitioning agency must be certified to provide treatment and must advise and notify the detainee of the need for such treatment. RCW 71.05.230(2), (3), (4).
The statute contemplates only two legally sufficient sets of signatures to a 14-day petition, either those of two physicians or those of one physician and a mental health professional who have examined the detainee. RCW 71.05.230(4). In clear and unambiguous language, the statute requires the signature of at least one physician who has examined the individual. Where the language of a statute is unambiguous, its plain meaning must not be altered through the guise of construction. State ex rel. T.B. v. CPC Fairfax Hosp., 129 Wash.2d 439, 451, 918 P.2d 497 (1996); see also In re Detention of Swanson, 115 Wash.2d 21, 27, 793 P.2d 962, 804 P.2d 1 (1990) (concerning statutory provisions applying to the 72-hour initial detention period; "[w]here statutory language is plain and unambiguous, a statute's meaning must be derived from the wording of the statute itself.") (quoting Human Rights Comm'n v. Cheney Sch. Dist. No. 30, 97 Wash.2d 118, 121, 641 P.2d 163 (1982)).
The majority reasons, however, that the signature requirement may be satisfied by substantial compliance. The effect of the majority's analysis is to rewrite the state to include an implied exception not contemplated by the statutory scheme.[3] Just as problematic, the majority's approach unaccountably departs from settled case law, relies upon an inapposite case, and fails to address the substantial/strict compliance question in any meaningful way. Crosby v. County of Spokane, 137 Wash.2d 296, 971 P.2d 32 (1999) is neither factually nor legally similar to this case. There, the issue was superior court appellate jurisdiction, and the issue was whether a statute that provided that a statutory writ of certiorari must be supported by an affidavit or verification could be satisfied by substantial compliance. The court held that it could, pointing out that the purpose of the affidavit/verification requirement is to assure the truthfulness of pleadings and discourage meritless claims. Id. at 36. The court observed that substantial compliance has been defined as actual compliance in respect to the substance essential to the statute's reasonable objectives, and concluded that where the governmental body to which the writ is directed has notice and stipulates to the writ's issuance, the purpose of the requirement is generally satisfied. Id. at 36, 37. Instead of arguing against the writ at a show cause hearing, the governmental body in Crosby stipulated to the writ. Id. at 37.
Here, the issue does not involve superior court appellate jurisdiction or statutory writ requirements, but instead involves statutory requirements for petitions for 14-day involuntary *1172 civil commitments. Fundamental, paramount principles underlie the civil commitment statutes which dictate that the statutory scheme must be adhered to strictly. Fourteen days of involuntary detention involves a significant deprivation of liberty. In re LaBelle, 107 Wash.2d 196, 221, 728 P.2d 138 (1986). The United States Supreme Court has stated that "for the ordinary citizen, commitment to a mental hospital produces `a massive curtailment of liberty....'" Vitek v. Jones, 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (quoting Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972)). Involuntary commitment involves not only the loss of freedom from confinement, but indisputably involves adverse social consequences to the detainee. Vitek, 445 U.S. at 492, 100 S.Ct. 1254; LaBelle, 107 Wash.2d at 221, 728 P.2d 138; see In re Harris, 98 Wash.2d 276, 279-80, 654 P.2d 109 (1982). Because involuntary commitment constitutes such a massive curtailment of liberty, mental illness alone is not a constitutionally adequate basis to forcibly confine a person, nor will the prospect of beneficial treatment to the mentally disordered serve as an independently sound reason. LaBelle, 107 Wash.2d at 201, 728 P.2d 138 (citing Humphrey, 405 U.S. at 509, 92 S.Ct. 1048). Moreover, the significant liberty interest at stake requires that due process guaranties accompany involuntary commitment for mental disorders. Vitek, 445 U.S. at 491-92, 100 S.Ct. 1254; Harris, 98 Wash.2d at 279, 654 P.2d 109; CPC Fairfax Hospital, 129 Wash.2d at 452, 918 P.2d 497 (holding continued detention of minor violative of Mental Health Service for Minors Act because of failure to file petition for additional 14-day detention).
In accord with these due process concerns, the Legislature has provided detailed, specific procedures for the detention and treatment of mentally disordered individuals throughout chapter 71.05 RCW, with careful attention to increasing the due process rights of detained persons as the prospect and duration of commitment lengthens. Although the procedural safeguards differ with the nature and length of the commitment sought, the Legislature has clearly delineated the specific processes to which a person is entitled, whether that person is subject to emergency detention,[4] extended confinement and/or treatment,[5] or some other less restrictive alternative.[6] The express, extensive statutory scheme indicates legislative intent that the procedures be strictly followed.[7]
Further, and utterly contrary to the majority's view, the liberty interest at stake is so important that this court has repeatedly held that the civil commitment statutes must be strictly construed. E.g., In re Detention of LaBelle, 107 Wash.2d 196, 205, 728 P.2d 138 (1986); In re Cross, 99 Wash.2d 373, 662 P.2d 828 (1983). The court has expressly directed that "`[w]here a statute prescribes a certain method of procedure to determine whether persons are insane, such inquiries must be conducted in the mode prescribed, and the statute regulating such proceedings must be followed strictly.'" In re Swanson, 115 Wash.2d at 27, 793 P.2d 962 (quoting In re Eastman, 151 Wash. 321, 322, 275 P. 724 (1929)). Strict, not substantial, compliance has been the law of this state where civil commitment is concerned.
Reference to a single inapposite case simply does not justify application of the substantial compliance standard in this case, especially in the face of a detailed, extensive statutory scheme and this court's cases holding that strict construction and strict compliance *1173 are required where involuntary commitment is concerned.
Moreover, the substantial compliance standard should not be applied here because its application contravenes clear legislative intent. As the court in Crosby explained, the substance essential to a statute's purpose must be satisfied before substantial compliance suffices. Consideration of two purposes served by the signature requirement leads to the conclusion that the doctrine should not be applied in this case. First, the requirement that a physician sign the petition serves as a procedural safeguard assuring an agency's or treatment facility's professional qualifications, thereby lessening the risk of unwarranted deprivation of the detainee's liberty. The requirement plainly is that before a petition for civil commitment is filed, a physician must examine the detainee, and his or her signature attests to the findings resulting from that medical examination, to the qualifications of the examiner, and to the legally necessary conclusion that the individual either presents a serious likelihood of harm or is gravely disabled.
This essential substance of the statutory requirement is not met in any respect by foregoing the requirement on a "promise" that a future affidavit will be provided to "cure" the failure to comply with the statute.
The second purpose of the signature requirement relates to the notice required. As a component of the due process which must be afforded detainees, notice must be meaningful. In Vitek, 445 U.S. 480, 100 S.Ct. 1254, the Court held unconstitutional a Nebraska statute which permitted transfer of a prison inmate to a mental hospital if a physician or psychologist found the prisoner to be suffering from a mental disease or defect which could not be properly treated in prison. The Court's decision turned on the important liberty interest at stake, and the Court held that such transfer could not occur without due process. The Court approved procedural requirements identified by the district court, including written notice that a transfer was being considered and a hearing, "`sufficiently after the notice to permit the prisoner to prepare....'" Vitek, 445 U.S. at 496, 100 S.Ct. 1254 (quoting Miller v. Vitek, 437 F.Supp. 569, 575 (D.C.Neb.1977)). The Court observed: "The notice requirement imposed by the District Court no more than recognizes that notice is essential to afford the prisoner an opportunity to challenge the contemplated action and to understand the nature of what is happening to him." Vitek, 445 U.S. at 494, 100 S.Ct. 1254 (quoting Wolff v. McDonnell, 418 U.S. 539, 564, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).
This court has also recognized the need for adequate notice. In In re Cross, 99 Wash.2d 373, 382, 662 P.2d 828 (1983), for example, the Court held that in a conditional release proceeding, the detainee's procedural rights were violated as a result of the petitioning facility's failure to provide complete notice, specifically a statement of the alternative grounds on which respondents sought detention. Id. at 382-84, 662 P.2d 828. There, the Court explained that the central purpose of the petition is to provide the detained person notice so as to apprise the individual of, and permit adequate preparation for, an impending hearing. Id. at 382, 662 P.2d 828 (citing Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 14, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) and Ashley v. Superior Court, 83 Wash.2d 630, 635, 521 P.2d 711 (1974)).
The Washington statute requires that a copy of the valid petition be made available to the detained person, his or her attorney, and his or her guardian or conservator prior to the probable cause hearing. RCW 71.05.230(5). When a physician signs a 14-day petition, affirming in his or her professional opinion the mental disorder and facts supporting a finding that the individual presents a likelihood of danger or is gravely disabled, the individual is advised of the basis for commitment, founded on a qualified medical examination. This information is essential to the individual's ability to prepare a challenge to the petition. The signature requirement of RCW 71.05.230(4) thus goes to the issue of proper notice to the detained person. The statutory requirement of two signatures, including at least one from a physician, provides notice to the detained, his or her attorney, and guardian or conservator, about the mental health professionals who *1174 have examined the detainee and are willing to attest to the statements in the petition. The signatures further provide the added reassurance that two qualified mental health professionals, including a physician, have not only conferred as to the examination and evaluation of the detainee, but have also jointly exercised their discretion in filing the petition requesting the extended detention of the mentally disordered person.
The link between the qualified professional's evaluation of the individual revealed in the petition and notice to the individual is an additional purpose relating to the signature requirement which is not satisfied to any degree by a petition which does not even contain the signature of an examining physician as required by the statute.
Accordingly, by applying a substantial compliance standard, the majority seriously erodes the procedural protections which the Legislature has mandated.
I would hold that the statutory signature requirement must be strictly complied with and it was not in the cases of Arnold Sheldon and Ellen Lucas.
Other aspects of the majority's analysis are also troubling. The majority is all too willing to accept the circumstances of the present cases as "unique," majority at 1158, finding that Sheldon and Lucas were so obviously mentally disordered and that the failure to obtain the statutory signatures were not the result of "oppression, carelessness, or attempted circumvention of the statutory procedural requirements." Majority at 1164. In doing so, the majority fails to recognize the unilateral discretionary authority its analysis gives to nonphysicians as a result. Here, a social worker had prepared and filed petitions with nothing more than his signature and a promise of a physician's later affidavit, which, incidentally, was not provided until the day of the probable cause hearing. The ad hoc nature of this procedure does not provide the procedural safeguards intended by the statute's signature requirement. See CPC Fairfax Hospital, 129 Wash.2d at 453, 918 P.2d 497 (once the State has granted a liberty interest by statute, "`due process protections are necessary "to insure that the state-created right is not arbitrarily abrogated."'") (quoting Vitek, 445 U.S. at 489, 100 S.Ct. 1254). Regardless of the circumstances, the statutory procedural safeguards should not be compromised by an agency's or treatment facility's failure to ensure the availability of qualified staff. Under the majority's broad holding, the unavailability of a physician due to sickness or some other "unique circumstance" essentially excuses an agency or treatment facility from the signature requirement.
Moreover, the majority's extensive recitation of the factual circumstances in these cases appears designed to convince that no matter how much the statutory requirements have been ignored, these individuals were so disturbed and such a danger to themselves or others, or so gravely disabled, that commitment was the only appropriate result in these cases despite noncompliance with statutory requirements.
The sad truth is that the legislation concerns deeply disturbed individuals, and many cases are likely to have similarly troubling facts about individuals' behavior and conditions. But there is absolutely nothing in the statutes that permits granting less due process based upon egregious facts. To the contrary, the statutes clearly contemplate procedures involving very disturbed individuals.
Finally, that the petitions may have been dismissed without prejudice is not a reason to dispense with individual's rights where civil commitment proceedings are concerned. The statute's plain language and the case law requiring strict construction of civil commitment statutes mandate dismissal where the procedural requirements have not been satisfied.

Notice
Of course, the signature requirement is not the only issue in this case concerning notice. Not only were the petitions in Arnold Sheldon's and Ellen Lucas' cases defective for lack of a physician's signature, the affidavits in both cases were filed on the day of the probable cause hearing and provided to the detainees' counsel just moments before the hearing, violating the individuals' due process *1175 rights. As noted, the United States Supreme Court has made it abundantly clear that "notice is essential" to provide the individual "an opportunity to challenge the contemplated action and to understand the nature of what is happening" to him or her and must be provided in time for the individual to prepare for the hearing. Vitek, 445 U.S. at 496, 100 S.Ct. 1254.
Accordingly, it is not enough to provide such notice moments before a hearing because it provides no opportunity for the individual to prepare any challenge to the 14-day petition. Sheldon and Lucas were not afforded the proper notice to which they were entitled.
The majority nevertheless suggests that Sheldon's and Lucas' rights were not compromised because, the majority says, they received basic notice and an opportunity to be heard. Majority at 1164. The majority points to the fact that Sheldon and Lucas do not complain of their initial emergency detention and that, ultimately, they were each served a copy of the (incomplete and invalid) petition and afforded a probable cause hearing for their additional 14-day detention. Id. The petition for an additional 14-day detention, however, is a different proceeding from the initial detention, and involves an even greater liberty interest of the detained person due to the extension of time. Further, whether the initial detention was constitutionally sufficient is not relevant to the question whether additional involuntary commitment for 14 days has a constitutionally adequate basis. See O'Connor v. Donaldson, 422 U.S. 563, 574-75, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Hence, the need for strict compliance with the statutory requirements for 14-day petitions regarding examination and evaluation of the detained, timeliness of petitions, court orders, and, not least of all, notice, remains the same regardless of whether there is any complaint about the initial detention.
Contrary to the majority's conclusion, these individuals did not have adequate notice.

Expert Testimony
In all three cases before the court, Bruce Work, the social worker who filed the petitions, provided the only expert testimony during the hearings as to the detainees' mental conditions. The majority holds that a social worker's diagnosis of a detainee's mental condition is sufficient expert testimony at a probable cause hearing to justify a 14-day commitment order. I disagree.
RCW 71.05 does not bar a social worker from testifying as to the mental condition of a detained person, and a social worker qualifies as a "mental health professional" under the civil commitment statutes. However, while a social worker's testimony is not per se inadmissible, under the statutory scheme such testimony alone cannot serve as the sole expert testimony regarding a detainee's mental condition so as to warrant a 14-day commitment order. The Legislature specifically requires at least one physician to directly participate in the evaluation and recommendation for extended detention. See, e.g., RCW 71.05.230(4). The Legislature thus requires a medical doctor to play a significant role in both the professional and legal sense in evaluation of the mental condition of a detainee and determination of the need for treatment or involuntary commitment. See LaBelle, 107 Wash.2d at 207, 728 P.2d 138 (noting the danger in excessive judicial deference to opinions of mental health professionals' findings of gravely disabled persons). It follows that a physician's testimony is a necessary predicate to a 14-day commitment order.
The majority's nearly exclusive reliance on ER 702 and 703 is too narrow a focus, because it overlooks legislative intent that a physician be involved in order to prevent inappropriate detention of mentally disordered persons and to safeguard their individual rights.
The majority's attempt to distinguish In re Detention of Twining, 77 Wash.App. 882, 894 P.2d 1331 (1995) is unpersuasive. There, the court concluded that psychiatric or psychological testimony was essential to the issue of whether an individual suffers from a mental abnormality or personality disorder which makes him likely to engage in predatory acts *1176 of sexual violence. Because the expert testimony proffered by the individual was not such testimony, the Court of Appeals held that the trial court did not err is refusing to admit it. Similar to the situation in Twining, in these cases, a physician's testimony is essential to the issue of whether the detainees present a likelihood of serious harm or are gravely disabled. The issue is not one of categorical conclusions as to who may present expert testimony, but whether the expert is qualified to give the kind of testimony necessary to a commitment order.
The result of the majority's analysis is that the discretion and evidentiary weight given to a social worker's signature and testimony in support of a 14-day petition is far too great to comport with the statutory requirement that a physician be involved in the commitment procedures.[8] Under the majority's holding, a physician assumes only the role of after-the fact consultations with a social worker who essentially assumes the primary role of determining whether, and to what extent involuntary detention should be sought.
The statutes do not support the unilateral discretion the majority is willing to grant individual mental health professionals who are untrained in psychiatric or neurological medicine. In addition, case law holds that strict construction applies to civil commitment statutes, yet the majority essentially allows an individual mental health professional who is not a physician to single-handedly determine the type and degree of mental health care for a detainee. In other words, a social worker may assume primary responsibility for not only filing a petition for extended detention, but for rendering expert diagnosis of the detainee's mental condition as well.
In light of the statutory requirement that at least one physician sign the petition, this Court should hold that expert testimony at a probable cause hearing on a petition for an additional 14-day involuntary detention of a person must include a physician's diagnosis of the detainee's mental condition.[9]
For the reasons set forth in this opinion, I dissent.
JOHNSON, ALEXANDER and SANDERS, JJ., concur.
NOTES
[1] "`County designated mental health professional' means a mental health professional appointed by the county to perform the duties specified in this chapter[.]" RCW 71.05.020(3).
[2] Dr. Neracs evaluated Sheldon on March 14 and prepared her affidavit that day because Dr. Dennis Gaither, the psychiatrist who initially saw Sheldon on March 12, was ill on March 14 and unavailable to sign the 14-day petition.
[3] Work testified: "It was not my observation that that was the case. That in fact he could read things, and he held them up close directly in from of him. Also his eye contact with me was good, which would suggest that blindness was probably not likely." Report of Proceedings at 22.
[4] If the affidavit had not been timely filed or the requisite two signatures obtained, dismissal would be required. In re Detention of R.P., 89 Wash.App. 212, 217, 948 P.2d 856 (1997).
[5] The dissent argues the petitioners lacked notice of the probable cause hearing because of the absence of a physician's signature. We disagree. We do not understand why a petition that would have been the same in every respect with a physician's signature provided constitutionally defective notice because it lacked a physician's signature. The petitioners were given adequate notice of the reasons supporting the petition for the 14-day confinement probable cause hearing in the body of the petition.
[6] The dissent's argument to the contrary is flawed because it confuses the petition for 14-day confinement with an actual confinement for 14-days. The 14-day petition requests a probable cause hearing to determine if actual confinement is warranted. An actual 14-day confinement is indeed a massive curtailment of liberty; the filing of a petition for a probable cause hearing is not. Nobody in these cases was confined a nanosecond longer than they otherwise would have been because the petitions lacked a physician's signature. No vital safeguard against a wrongful involuntary commitment was lacking here.

The dissent's attempt to distinguish away Crosby is also unsound. In Crosby, we held the total absence of any compliance whatsoever, including the lack of any attempt to comply, could constitute substantial compliance so long as there has been "actual compliance in respect to the substance essential to every reasonable objective of [a] statute." Crosby, 137 Wash.2d at 301, 971 P.2d 32 (citing several earlier cases). There, we did not limit the scope of this principle of substantial compliance to writ of certiorari cases dealing with a superior court's appellate jurisdiction, as the dissent now suggests.
[7] The dissent does not argue Work's testimony was inadmissible, but that it was not sufficient, that a physician's testimony was also required. We agree. The physicians testified at the probable cause hearings by affidavit without objection from the petitioners.
[8] The original statutes for the other professions defined scope of practice quite narrowly. The marriage and family therapist scope of practice initially read:

The practice of marriage and family therapy is that aspect of counseling that involves the assessment and treatment of impaired marriage or family relationships including, but not limited to, premarital and postdivorce relationships and the enhancement of marital and family relationships via use of educational, sociological, and psychotherapeutic theories and techniques.
Laws of 1991, ch. 3, § 28(3). The 1993 amendment established a much more expansive scope of practice:
The practice of marriage and family therapy is that aspect of counseling that involves the rendering of professional marriage and family therapy services to individuals, couples, and families, singly or in groups, whether such services are offered directly to the general public or through organizations, either public or private, for a fee, monetary or otherwise. "Marriage and family therapy" means the diagnosis and treatment of mental and emotional disorders, whether cognitive, affective, or behavioral, within the context of marriage and family systems. Marriage and family therapy involves the professional application of family systems theories and techniques in the delivery of services to individuals, couples, and families for the purpose of treating such disorders.
Laws of 1993, ch. 259, § 1(2) (codified at RCW 18.19.130(2)).
Similarly, the scope of practice for mental health counselors initially read:
Certified mental health practice is that aspect of counseling that involves the rendering to individuals, groups, organizations, corporations, institutions, government agencies, or the general public a mental health counseling service emphasizing a wellness model rather than an illness model in the application of therapeutic principles, methods, or procedures of mental health counseling to assist the client in achieving effective personal, organizational, institutional, social, educational, and vocational development and adjustment and to assist the client in achieving independence and autonomy in the helping relationship.
Laws of 1991, ch. 3, § 27(4). The 1995 amendment established a much broader scope of practice:
Certified mental health counseling practice is that aspect of counseling that involves the provision of professional mental health counseling services to individuals, couples, and families, singly or in groups, whether the services are offered directly to the general public or through organizations, either public or private, for a fee, monetary or otherwise. "Certified mental health counseling" means the application of principles of human development, learning theory, group dynamics, and etiology of mental illness and dysfunctional behavior to individuals, couples, families, groups, and organizations, for the purpose of treating mental disorders and promoting optimal mental health and functionality. Certified mental health counseling also includes, but is not limited to, the assessment, diagnosis, and treatment of mental and emotional disorders, educational techniques developed to prevent such disorders, as well as the application of a wellness model of mental health.
Laws of 1995, ch. 183, § 1(2) (codified at RCW 18.19.120(2)).
[9] A trial court's discretion is not, of course, limitless; it is bounded by the manifest abuse standard. Each case will be different depending on the experience of the social worker. A social worker whose training and experience were in family counseling and therapy might in fact be unqualified to testify as to mental disorders. In any case, the decision as to admissibility should repose in the trial court.
[10] Sheldon, McClanahan, and Lucas stated a third issue in their petition for review: "Where the social worker's `diagnosis' was the sole expert testimony establishing the statutory prerequisite of a `mental disorder,' is the remaining evidence insufficient to justify the trial court's order of involuntary commitment." Pet. For Review at 2. They have made no arguments to support this issue in either their petition for review or supplemental brief. We do not consider it. Kadoranian v. Bellingham Police Dep't, 119 Wash.2d 178, 191, 829 P.2d 1061 (1992) (issue not briefed deemed waived).
[1] RCW 71.05.020(15) defines "mental disorder" as "any organic, mental, or emotional impairment which has substantial adverse effects on an individual's cognitive or volitional functions...."
[2] Of course, the majority fails to define the parameters of this judicially created exception or to explain why substantial compliance is applicable only if "unique circumstances" are present.
[3] Had the Legislature intended to create an exception to the signature requirement, it would have done so expressly. See In re Detention of Swanson, 115 Wash.2d 21, 27, 804 P.2d 1 (1990) (had Legislature intended initial detention period to be measured in days rather than hours, it would have said so). Moreover, the Legislature chose to limit the signature provision by using the word "must"creating a mandatory duty for the petitioning agency or treatment facility. Cf. State v. Krall, 125 Wash.2d 146, 148-49, 881 P.2d 1040 (1994) ("shall" in a statute creates mandatory requirement absent contrary legislative intent); State v. Dodd, 120 Wash.2d 1, 14, 838 P.2d 86 (1992) ("shall" (as synonymous with "must") is a mandatory obligation).
[4] See, e.g., RCW 71.05.150.180 providing for specific procedures for the 72-hour emergency detention, which involve investigation and evaluation of the alleged facts about the person's a mental disorder, filing of petition, notice to person subject to emergency detention, and a superior court's role in facilitating the process.
[5] See, e.g., RCW 71.05.230.320 providing for specific procedures regarding the detention and treatment of a person beyond the 72-hour emergency period. Such procedures refer to the examination, evaluation, and the judicial proceedings a person is entitled to.
[6] Id.
[7] This Court has previously declined to apply a substantial compliance standard in the face of evidence of legislative intent that strict compliance was necessary. Union Bay Preservation Coalition v. Cosmos Dev. & Admin. Corp., 127 Wash.2d 614, 902 P.2d 1247 (1995).
[8] Although the majority recognizes the fact that a social worker's testimony is insufficient to constitute expert testimony of a detainee's mental disorder, it nevertheless confuses the physicians' affidavits submitted in support of the petitions with testimony that was otherwise required at the probable cause hearing. The physicians' affidavits were not, as the majority believes, unobjected to expert testimony for they were submitted only to support the petitions. Indeed, before proceeding with the probable cause hearings for Sheldon and Lucas, counsel for both detainees did object to the physicians' affidavits and moved for dismissal of the cases on grounds that the petitions were defective and the physicians' later affidavits could not remedy such defect. Report of Proceedings (RP), Arnold Sheldon at 2-9; RP, Ellen Lucas at 2-4.
[9] The Guidelines for Involuntary Civil Commitment support creating such a requirement noting that the testimony of at least one psychiatrist or clinical psychologist who has examined the detainee gives the parties and the court an opportunity to probe the statements and the conclusions contained in the written reports. National Center for State Courts' Guidelines for Involuntary Civil Commitment, in 10 Mental & Physical Disability Law Reporter 409, 488 (1986).