# NOTICE: SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of<br><br>E.S.,<br><br>       Appellant. | No.  55426-7-II<br><br><br>PUBLISHED OPINION |

GLASGOW, C.J.—ES, a 70-year-old woman, was involuntarily committed after she began acting aggressively toward staff at the residential care facility where she lived. Petitioners obtained an order for 14 days of involuntary treatment. A clinical social worker then sought to file a 90-day petition for additional treatment but, in part because the attending physician declined to sign the petition, hospital staff missed the statutory filing deadline.

After missing the deadline, hospital staff dropped the 14-day hold prior to its expiration and, without notifying ES of her technical release, rereferred ES for another period of emergency detention under a new cause number. They then filed a second 14-day commitment petition under this new cause number. ES filed a motion to dismiss the second 14-day petition based on the State's total disregard of involuntary treatment act requirements under chapter 71.05 RCW and violation of due process. The superior court denied ES's motion and ordered her committed for an additional 14 days of involuntary treatment. ES appeals both the denial of her motion to dismiss and the second 14-day commitment order.

We follow our recent opinion in *In re Detention of N.G.*, 20 Wn. App. 2d 319, 503 P.3d 1 (2022), *pet. for review filed*, No. 100690-0 (Wash. Feb. 24, 2022), and conclude that dismissal of a 14-day petition is an available remedy where staff initiate a new case for the purpose of

No. 55426-7-II

continuing a committed person's involuntary treatment in total disregard of involuntary treatment act requirements. Here, because hospital staff knowingly and willfully violated the act's requirements where other legally appropriate options were available, resulting in a significant deprivation of ES's liberty under circumstances where the risk of serious harm to ES and the public was relatively minimal, we hold that hospital staff totally disregarded the act's requirements. We reverse the superior court's order denying ES's motion to dismiss the second 14-day commitment petition and remand for the court to vacate the second 14-day commitment order.

FACTS

I. BACKGROUND

In December 2020, ES was 70 years old. She was 5 feet and 2 inches tall, and she weighed 140 pounds. ES had been living in a residential care facility, where she was "doing really well" until she stopped taking her psychiatric medications. Clerk's Papers (CP) at 2, 44.

ES has been diagnosed with schizoaffective disorder and antisocial personality disorder. After she stopped taking her medications, ES "became agitated and assaultive to where staff could not manage her." CP at 2. When she was taken into emergency custody on December 21, 2020, ES "made threatening statements to staff and was spitting towards staff." CP at 25. She cursed at and tried to kick the nurse who came to assess her. ES was disheveled, had poor hygiene, and repeatedly removed her clothing. ES was moved to an evaluation and treatment center.

II. DETENTION UNDER CAUSE NUMBER 20-6-01826-1

On December 22, 2020, an examining psychiatric advanced registered nurse practitioner and an examining mental health professional petitioned for 14 days of involuntary treatment for ES. The petitioners believed ES was gravely disabled and required "intensive, supervised, 24-hour

2

No. 55426-7-II

care." *Id.* After assessing ES, they concluded that due to "disorganized thinking [and] lack of volitional control," ES needed further inpatient care and that if ES were "to leave prematurely, [she] would be at risk to harm herself due to inability to take care [of her] basic health and safety needs." CP at 26. This petition was filed under Pierce County Superior Court cause number 20-6-01826-1.

On December 23, 2020, a superior court commissioner found by a preponderance of the evidence that ES was gravely disabled and ordered ES detained for "not more than 14 days [of] involuntary treatment." CP at 33 (boldface omitted). This order would have expired on January 6, 2021.

The commissioner's order notified ES: "If involuntary treatment beyond a 14 day period is sought, Respondent shall have the right to a full hearing or jury trial as required by RCW 71.05.310." CP at 34 (boldface omitted). RCW 71.05.310 gives the person named in a 90-day petition the right to request a jury trial; the right to hold the petitioner to a higher burden of clear, cogent, and convincing evidence to support continued detention; and the right to be present at the proceeding, "which shall in all respects accord with the constitutional guarantees of due process of law and the rules of evidence."

On December 24, 2020, ES was transferred from the evaluation and treatment center to Tacoma General Hospital because she fractured her arm and needed surgery. ES was transferred to Tacoma General on a single bed certification. Typically, mental health evaluation and treatment is provided by a licensed or certified "evaluation and treatment facility." RCW 71.05.020(23). However, the Health Care Authority "may certify single beds as temporary evaluation and treatment beds" at other facilities, such as local hospitals. *Id.*; *see also* RCW 71.05.745.

3

No. 55426-7-II

The Washington Supreme Court has previously rejected attempts to use single bed certifications to address general overcrowding at evaluation and treatment facilities, especially because when a person is involuntarily committed in an emergency room or acute care medical hospital, they tend to receive "'less care'" in "'a more restrictive environment.'" *In re Det. of D.W.*, 181 Wn.2d 201, 206, 332 P.3d 423 (2014).

### III. DETENTION UNDER CAUSE NUMBER 21-6-00027-1

Staff at Tacoma General believed ES should receive further treatment after the 14-day order expired and prepared to file a 90-day petition. However, the attending physician on "the day that [they] needed to file . . . was unfamiliar with the Court's timeframe and thought that [they] could wait a few days and declined to sign the petition." Verbatim Report of Proceedings (VRP) (Jan. 13, 2021) at 33. The physician refused to sign because they "did not want the patient to be stuck . . . at an acute care medical hospital for the full 90 days" on a single bed certification, and they "hoped that by not signing that it would pressure the community to move [ES] . . . versus keeping her in an acute care medical facility." *Id.* at 36. Staff were not successful in contacting the physician's supervisor, and they did not obtain another signature for the petition.

Under the involuntary treatment act, the 90-day petition needed to be filed by Sunday, January 3, 2021, three days before the 14-day commitment order expired on January 6. *See* RCW 71.05.300(1). The social worker confirmed that she knew the 90-day petition needed to be filed by January 3, 2021. The attending physician refused to sign the petition on Thursday, December 31, 2020. Neither the clinical social worker nor the attending physician sought a continuance under RCW 71.05.210(3), which allows a continuance in involuntary treatment act proceedings of up to

4

No. 55426-7-II

14 days in order to accommodate hospitalization for medical care. Staff did not file a 90-day petition for ES.

Instead, on January 4, 2021, "the 14-day hold was dropped by the attending physician," and ES "was re-referred to the crisis responder for re-evaluation" for an emergency commitment. VRP (Jan. 13, 2021) at 34. When the hold was dropped, ES was not given the opportunity to leave the hospital and return to the community.

The social worker rereferred ES for an emergency custody evaluation at 4:45 p.m. on January 4, 2021. RCW 71.05.153(4) requires that designated crisis responders respond to emergency custody evaluation requests "[w]ithin twelve hours of notice." On January 5, 2021, at 10:00 a.m., over 17 hours after the social worker's referral, a designated crisis responder contacted ES to perform a mental status examination. The responder's report noted the reason for his referral as "[c]oncerns that the patient is still unstable after the 90 day petition was not filed due to an underlying mood disorder." CP at 43.

The designated crisis responder submitted a petition for emergency detention of ES under a new cause number, 21-6-00027-1. The petition stated, "The respondent was referred for an [involuntary treatment act] evaluation after the 90 day petition was not filed (doctor declined to sign the petition) and the 14 day hold was dropped early so that the patient could be evaluated again." CP at 2. When the crisis responder evaluated ES, she did not cooperate with the evaluation and instead cursed and yelled at the responder. The responder reported that the decision to detain ES was based on her prior refusal of medical treatment for her arm, "emotionally labile mood, [noncompliance with] psychiatric medication," and refusal of assistance with activities of daily living. CP at 4. The responder believed that ES had "made little to no progress since she was

5

No. 55426-7-II

detained" in December 2020 and that she continued to be gravely disabled. *Id.* The petition also reflected that a nurse reported ES used her bedside table, her cast, and hospital cords "'as weapons,'" but this particular statement was not admitted into evidence at the commitment hearing. CP at 2.

At 12:00 p.m. on January 5, 2021, the designated crisis responder notified ES that she was being taken into emergency custody at Tacoma General under a new cause number. The responder also provided ES with a statement of her rights, which explained that she would be "released within a period of 120 hours," unless a judicial hearing was held and it was determined that there was probable cause to detain her "for up to an additional 14 days." CP at 5. The designated crisis responder also requested a single bed certification for Tacoma General and indicated that ES required medical services that were not available at a certified evaluation and treatment facility.

On January 8, 2021, an examining physician and examining mental health professional petitioned for 14 days of involuntary treatment for ES under the 2021 cause number. ES refused to participate in the assessment, and she was observed yelling, cursing, and throwing items from her room at staff. Petitioners alleged that ES was "gravely disabled due to lack of cognitive and volitional control, impulsivity, and an inability to care for her routine functioning, and [activities of daily living]" and that her "hostile behavior put[] her at imminent risk in the community." CP at 14. They did not recommend a less restrictive alternative because ES was "not able to care for her basic needs" and was "putting her health and safety at risk by throwing her urine and feces as well as intentional incontinence." *Id.* Petitioners asserted that ES required "intensive, supervised, 24-hour care." CP at 12.

No. 55426-7-II

IV. MOTION TO DISMISS THE 14-DAY PETITION UNDER THE 2021 CAUSE NUMBER

On January 11, 2021, ES filed a motion to dismiss the 14-day petition under the 2021 cause number based on "a total disregard of the statutory requirements and rights set forth in [the involuntary treatment act]." CP at 16. ES further argued that filing successive 14-day petitions for involuntary treatment "due to a potential co-petitioner's refusal to sign off on a petition for further treatment" violated her right to due process. CP at 18. Because of the successive 14-day petitions, ES was detained for longer than 14 days without an opportunity to exercise her right to a full hearing or jury trial, or to hold the State to a higher burden of proof than preponderance of the evidence, as required by RCW 71.05.310.

On the record, the superior court commissioner stated he found it "troubling" that there was a doctor at Tacoma General who needed "further education" on the procedures for involuntary commitment. VRP (Jan. 13, 2021) at 50. Moreover, the social worker involved in this case, who had "a pretty long history" of working on these petitions at the hospital and "understands the timelines for them," had the ability to "seek out additional support" from other hospital staff to get the petition signed, but she "did not pursue that." *Id.* Although there was "somehow a disruption" in the process, perhaps because of the New Year's holiday, that "doesn't disrupt what the statute requires." *Id.* at 51.

The designated crisis responder was also "pretty experience[d]" but "was proceeding on assumptions that under the statute don't hold true." *Id.* at 53. "[H]e didn't seem to perceive at all that there was a 12-hour window from referral to his arrival," which caused the commissioner concerns about due process. *Id.* at 55.

7

No. 55426-7-II

However, the commissioner did not find a total disregard of the statutory requirements. He expressed concern that if he were to decide ES's motion to dismiss "on a technical basis," the parties would be "back in very short order on a new petition because of respondent's inability to care for herself and the risks." *Id.* at 56. "This case sort of screams at me to say, you know, the process simply was not followed -- whether it was an egregious total disregard, not just simply a disregard, there was disregard of the statute without question." *Id.* at 58. He also noted that one option was to continue the case for up to 14 days based on ES's hospitalization for medical treatment under RCW 71.05.210(3), but a continuance was not requested. Although he described it as "a close call," the commissioner ultimately did not find total disregard and did not believe dismissal was the appropriate remedy. *Id.*

The superior court entered written findings and conclusions to support the denial of the motion to dismiss, which "incorporate[d] by reference the oral findings of fact and conclusions of law." CP at 70. The court found that ES was evaluated for a 90-day involuntary treatment petition at Tacoma General by a doctor, that "[t]he doctor had an incorrect understanding about the filing deadline and process," and that "[t]he doctor refused to sign the petition based on the belief that single bed certifications were inappropriate for longer-term civil commitment periods." CP at 70-71. Tacoma General then "issued a notice for release/discharge of the patient prior to the expiration of the 14-day order" and rereferred her for another emergency custody evaluation. CP at 71. The designated crisis responder evaluated ES "approximately 17 hours after the request for emergency evaluation was made" and erroneously "believed that they were not subject to a 12-hour time limit to conduct the evaluation." *Id.* The superior court found that ES "remain[ed] in need of further treatment and would be at risk if released." *Id.*

8

No. 55426-7-II

Even though ES "was not afforded the opportunity to leave the facility" when the 14-day hold under the 2020 cause number was dropped, the superior court concluded that the two 14-day detentions were "not continuous" and that the detention under the 2020 cause number "had been terminated before the emergency detention was initiated under this [2021] cause number." CP at 72. It determined that "the two time violations in this case, when considered either each individually, or together, did not rise to the level of a total disregard of the statutory requirements" and that "the purposes of [the involuntary treatment act] as considered under the facts of this case weigh in favor of denying the motion to dismiss." *Id.*

After denying the motion to dismiss, the superior court proceeded to the probable cause hearing on the second 14-day commitment petition. In addition to hearing testimony from one of the petitioners and the attending social worker, the court heard testimony from the administrator of the residential care facility where ES had previously been living. The administrator testified that ES had been removed when she was "in a crisis situation," but the facility was holding a bed for her to return to when she "stabilized." VRP (Jan. 15, 2021) at 103-05. The residential care facility had a psychiatrist and mental health professional on staff.

The superior court found that ES was gravely disabled because as a result of her mental health disorders, she "manifest[ed] severe deterioration in routine functioning" and was "not receiving such care as is essential for . . . her health or safety." CP at 80; *see* RCW 71.05.020(24)(b). It ordered ES detained "for not more than 14 days [of] involuntary treatment" under the 2021 cause number. CP at 82 (boldface omitted).

The court's commitment order noted that ES was "[m]alodorous at times," made "delusional/paranoid statements," and had engaged in "[a]ssaultive behaviors," such as

9

No. 55426-7-II

"throw[ing] things at nursing staff." CP at 80. It also noted the testimony indicating that upon release, ES could return to the residential care facility where she was previously living.

The State later filed a 90-day commitment petition but moved to voluntarily dismiss it by stipulation of the parties because ES was expected to be discharged to a memory care facility, presumably the residential care facility where she previously lived. The superior court dismissed the 90-day petition.

ANALYSIS

Although ES is no longer detained under the orders at issue here, her appeal is not moot. The legislature has encouraged courts to consider "all available evidence concerning the respondent's historical behavior" when determining whether a person is gravely disabled and to give "great weight" to a person's "prior history of decompensation leading to repeated hospitalizations" when deciding whether a less restrictive alternative should be ordered. RCW 71.05.012, .245(1); *see also* RCW 71.05.212(1)(d) (requiring designated crisis responders and other health professionals to consider "all reasonably available information," including prior commitments, when conducting an evaluation). The period of detention at issue in this case is currently designated as two separate involuntary commitments on ES's records. "Because an involuntary commitment order may have adverse consequences on future involuntary commitment determinations," we may still provide effective relief by holding that the second 14-day commitment order was improper. *In re Det. of M.K.*, 168 Wn. App. 621, 625, 279 P.3d 897 (2012). And even if the appeal were technically moot, both parties agree that the question presented should be addressed because it is of continuing and substantial public interest.

10

No. 55426-7-II

## I. INVOLUNTARY TREATMENT ACT

A.      Purpose and Intent

The legislature enacted the involuntary treatment act "to provide specific procedural protections for mentally ill persons subject to involuntary mental [health] treatment." *In re Det. of A.S.*, 138 Wn.2d 898, 909, 982 P.2d 1156 (1999). It expressly intended:

> (a) To protect the health and safety of persons suffering from behavioral health disorders and to protect public safety through use of the parens patriae and police powers of the state;
> (b) To prevent inappropriate, indefinite commitment of persons living with behavioral health disorders and to eliminate legal disabilities that arise from such commitment;
> (c) To provide prompt evaluation and timely and appropriate treatment of persons with serious behavioral health disorders;
> (d) To safeguard individual rights;
> (e) To provide continuity of care for persons with serious behavioral health disorders;
> (f) To encourage the full use of all existing agencies, professional personnel, and public funds to prevent duplication of services and unnecessary expenditures; and
> (g) To encourage, whenever appropriate, that services be provided within the community.

RCW 71.05.010(1)(a)-(g). To achieve these purposes, the act "provides for involuntary commitment in stages" of detentions that increase in length. *In re Det. of Dydasco*, 135 Wn.2d 943, 947, 959 P.2d 1111 (1998). Individuals with behavioral health disorders may be involuntarily detained for periods of up to 120 hours, 14 days, 90 days, or 180 days, if medical and mental health professionals determine that they meet certain criteria warranting involuntary commitment. The act provides specific procedures for initiating and challenging each length of detention. *See* RCW 71.05.030 ("Persons suffering from a behavioral health disorder may not be involuntarily committed for treatment of such disorder except pursuant to provisions of this chapter."). Because involuntary commitment is "a significant deprivation of liberty," the involuntary treatment act's

11

No. 55426-7-II

provisions must be "strictly construed." *In re Det. of C.W.*, 147 Wn.2d 259, 277, 53 P.3d 979 (2002). However, we must also consider the intent of the act and the need to avoid absurd results. *Id.* at 272. There is a presumption in favor of deciding involuntary treatment act petitions on their merits, unless the statutory requirements were totally disregarded. RCW 71.05.010(2); *see also C.W.*, 147 Wn.2d at 281.

B.      Emergency Detention

A designated crisis responder may take a person into emergency custody "for not more than one hundred twenty hours" if the responder receives and verifies "information alleging that a person, as the result of a behavioral health disorder, presents an imminent likelihood of serious harm, or is in imminent danger because of being gravely disabled." RCW 71.05.153(1). "Within twelve hours of notice of the need for evaluation, not counting time periods prior to medical clearance, the designated crisis responder must determine whether the individual meets detention criteria." RCW 71.05.153(4).

If the admitting facility determines that a person's "physical condition reveals the need for hospitalization" for medical treatment, the facility must transfer the person to an appropriate hospital. RCW 71.05.210(3). If this occurs, "the court shall order such continuance in proceedings under this chapter as may be necessary, but in no event may this continuance be more than fourteen days." *Id.* The broad application of this provision to the entire chapter suggests courts have flexibility to grant this continuance no matter what stage of involuntary treatment act proceedings the patient is in.

No. 55426-7-II

C.      14-Day Detention

"A person detained for one hundred twenty hour evaluation and treatment may be committed for not more than fourteen additional days of involuntary intensive treatment" if statutory requirements are met. RCW 71.05.230. A petition for 14 days of involuntary treatment "may only be filed if" the person's condition is "caused by a behavioral health disorder and results in: (a) A likelihood of serious harm; (b) the person being gravely disabled; or (c) the person being in need of assisted outpatient behavioral health treatment." RCW 71.05.230(1).

If a petition for 14 days of involuntary treatment is filed, the superior court must hold a probable cause hearing. RCW 71.05.240(1). There is no right to a jury trial at this stage. *In re Det. of S.E.*, 199 Wn. App. 609, 611, 400 P.3d 1271 (2017).

After the probable cause hearing, "if the court finds by a preponderance of the evidence that such person, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled," and finds that less restrictive alternatives are not "in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed fourteen days." RCW 71.05.240(4)(a). "The court shall notify the person orally and in writing that if involuntary treatment is sought beyond the fourteen-day inpatient . . . treatment period, the person has the right to a full hearing or jury trial." RCW 71.05.240(6).

Involuntary treatment "shall terminate sooner" than 14 days if professional staff believe that "(a) the person no longer constitutes a likelihood of serious harm, or (b) no longer is gravely disabled, or (c) is prepared to accept voluntary treatment upon referral, or (d) is to remain in the facility providing intensive treatment on a voluntary basis." RCW 71.05.260(1). "A person who has been detained for fourteen days of intensive treatment shall be released at the end of the

13

No. 55426-7-II

fourteen days," unless the person "agrees to receive further treatment on a voluntary basis" or "RCW 71.05.280 is applicable." RCW 71.05.260(2).

RCW 71.05.280 provides, in part, that if the person remains gravely disabled "[a]t the expiration of the fourteen-day period of intensive treatment," and other statutory requirements are met, the person may be committed for 90 days of further involuntary treatment. RCW 71.05.280(4); *see also* RCW 71.05.230(8), .320(1)(a).

D.     90-Day and 180-Day Detentions

"At any time during a person's fourteen day intensive treatment period," but at least three days before the treatment period expires, professional staff or the designated crisis responder may petition the superior court for an order requiring the person to undergo 90 days of additional treatment under RCW 71.05.280. RCW 71.05.290(1), .300(1). The petition must be "supported by affidavits based on an examination of the patient," and it must be signed by two staff members. RCW 71.05.290(2)(a)(i). These staff members may be physicians, physician assistants, or psychiatric advanced registered nurse practitioners, and one mental health professional. RCW 71.05.290(2)(a)(i)(A)-(B).

The person named in the 90-day petition is entitled to a jury trial, should they request one. RCW 71.05.310. The burden of proof is on the petitioner to show that further detention is warranted by clear, cogent, and convincing evidence. *Id.*; *see also A.S.*, 138 Wn.2d at 910 ("Should the State seek additional commitment of the individual, the burden escalates.").

Under RCW 71.05.320(1)(a), "if the court or jury finds that grounds set forth in RCW 71.05.280 have been proven and that the best interests of the person or others will not be served by a less restrictive treatment," then the court will remand the person to an evaluation and treatment

14

No. 55426-7-II

facility "for a further period of intensive treatment not to exceed ninety days from the date of judgment."

To detain a person beyond the 90-day commitment period, staff may file a 180-day petition. RCW 71.05.320(4), (6)(a). "At the end of the one hundred eighty-day period of commitment, . . . the committed person shall be released unless a petition for an additional one hundred eighty-day period of continued treatment is filed and heard in the same manner." RCW 71.05.320(6)(b). "Successive one hundred eighty-day commitments are permissible on the same grounds and pursuant to the same procedures as the original one hundred eighty-day commitment." *Id.*

II. SUCCESSIVE PETITIONS FOR 14-DAY DETENTION UNDER THE ACT

ES argues that to detain a person beyond the period authorized by the 14-day petition, the hospital must file a timely 90-day petition. "When the treating facility cannot meet the statutory criteria to petition for additional treatment after the 14-day commitment, a strict construction of the statute does not allow the hospital to bring the individual back to stage one of detention." Br. of Appellant E.S. at 19. We agree that the act does not permit successive 14-day detentions.

We review questions of statutory interpretation de novo. *N.G.*, 20 Wn. App. 2d at 833. When reviewing the superior court's findings of fact and conclusions of law, we evaluate whether there is substantial evidence in the record to support the findings of fact and whether the findings support the conclusions of law. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d at 1009 (2022).

As an initial matter, the State argues it was consistent with statutory requirements to release ES early because "nothing in [RCW 71.06.260(1)] limits the authority of the facility to release the patient sooner for other reasons than those specified" and ES was ordered "detained for *not more*

15

No. 55426-7-II

*than* 14 days." Br. of Resp't State of Wash. (Br. of Resp't) at 27 (emphasis added). RCW 71.05.260(1) lists specific circumstances where a person's involuntary commitment "shall terminate sooner" than 14 days. The commitment must be terminated if staff believe the person "no longer constitutes a likelihood of serious harm" or "no longer is gravely disabled" or if the person is prepared to accept treatment voluntarily either by referral or by remaining at the detaining facility. RCW 71.05.260(1)(a)-(d). Here, staff continued to believe that ES would present a risk of serious harm if released and was gravely disabled, and the State fails to show that ES was prepared to accept treatment voluntarily. Thus, the staff's decision to nominally release ES early for the sole purpose of legally reinitiating an involuntary detention was not supported by the language of this statute.

Additionally, it is clear from the structure of the involuntary treatment act that the legislature did not intend to allow for consecutive or successive 14-day detentions. *Compare* RCW 71.05.290(1), *and* .320(1)(a) (allowing staff to petition for "an additional period of treatment" beyond the 14-day period and the court to impose "a further period of intensive treatment not to exceed ninety days"), *with* RCW 71.05.320(6)(b) (expressly allowing staff to petition for "[s]uccessive one hundred eighty-day commitments"). The act is intended to be applied "in stages," with increasing terms of involuntary treatment and detention to be accompanied by increasing procedural protections. *Dydasco*, 135 Wn.2d at 947. For example, before a person may be subjected to involuntary treatment "beyond the fourteen-day inpatient . . . treatment period, the person has the right to a full hearing or jury trial," RCW 71.05.240(6), and the State must meet a clear, cogent, and convincing burden. RCW 71.05.310.

No. 55426-7-II

Unless the person voluntarily agrees to further treatment or is subject to further involuntary treatment under RCW 71.05.280, "[a] person who has been detained for fourteen days of intensive treatment shall be released at the end of the fourteen days." RCW 71.05.260(2). The involuntary treatment act does not provide an option to reinitiate an emergency detention or to file a new 14-day petition at this time.

In *N.G.*, Western State Hospital reinitiated emergency detentions and filed 14-day commitment petitions under new cause numbers after realizing that two people's 180-day involuntary commitment orders had expired. 20 Wn. App. 2d at 822. For one patient, staff did not immediately realize that the orders had expired, at least in part due to an "unreliable computer system." *Id.* at 823. We recognized, "Nothing in the [involuntary treatment act] allows for a 180-day commitment to be followed immediately, without a break, by a 72-hour detention and a 14-day commitment." *Id.* at 831. And we held that dismissal of the new 14-day commitment petitions was an available remedy because the new cause numbers did not really represent "'new'" cases. *Id.* at 830. Rather, they represented attempts "to extend the existing unlawful detentions" and were "a direct continuation of the previous cases." *Id.* Additionally, if dismissal were not an available remedy under these circumstances, a facility "could completely ignore [involuntary treatment act] requirements . . . without any meaningful repercussions, knowing that the detention could be extended simply by obtaining a new 72-hour detention and filing a new 14-day petition." *Id.* at 831. Allowing this procedure would be contrary to the involuntary treatment act's stated intentions of preventing inappropriate, indefinite commitment and safeguarding individual rights. *Id.* (citing RCW 71.05.010(1)(b), (d)).

17

No. 55426-7-II

Here, the superior court found that ES's two periods of detention were not continuous, so the State maintains that they were compliant with the involuntary treatment act. There is some support for this idea in the statutory language, which defines "release" only as "legal termination of the commitment." RCW 71.05.020(48). Testimony at the hearing on ES's motion to dismiss showed that an attending physician "dropped" the 14-day hold and a social worker rereferred ES to a designated crisis responder. VRP (Jan. 13, 2021) at 34. Strictly construing the definition of "release" from the act could support a conclusion that, if the attending physician legally terminated ES's detention, this was sufficient to release ES from the detention and permit the start of a new involuntary commitment case.

But if this were all it took to effectuate a "release[] at the end of the fourteen days," as required by RCW 71.05.260(2), committed persons would be left with very little protection against unwarranted or indefinite detentions, contrary to the legislature's intent. Although the underlying facts of this case differ slightly, the procedure used to continue ES's detention was similar to the procedure used in *N.G.*, and the same concerns we articulated in *N.G.* are present here. The new cause number did not represent a truly new case; it was an attempt to extend or continue an existing detention that was about to become improper. Additionally, ES was not even notified when the technical release occurred.

ES never returned to the community between the detentions under the 2020 and 2021 cause numbers, as staff did not notify her when the hold on her was "dropped." VRP (Jan. 13, 2021) at 34; *see also* Br. of Resp't at 4 ("[S]he wasn't expressly notified that the hold had been lifted."). This lack of notice to ES that she was free to go is a key fact that makes this case different from *In re Detention of D.H.*, 20 Wn. App. 2d 840, 502 P.3d 1284 (2022), *pet. for review filed*, No.

18

No. 55426-7-II

100716-7 (Wash. Mar. 3, 2022), where we concluded that the superior court did not err in denying a motion to dismiss based on successive 72-hour detentions. In *D.H.*, we affirmed the superior court in part because DH voluntarily agreed to commitment for a period of time before changing his mind and requesting discharge. *Id.* at 850. Here, ES was detained involuntarily and was only notified the day before her initial 14 days of detention was set to expire that she was again subject to an emergency detention—an additional 120 hours, or 5 days, with limited opportunity for judicial review.

Then, on January 15, 2021, after 23 days of involuntary commitment, the State was able to procure an additional 14 days of detention based only on proof by a preponderance of the evidence before a court commissioner. The legislature has provided that a person named in a 90-day petition is entitled to a jury trial, should they request one, and to hold petitioners to a clear, cogent, and convincing burden of proof before they may be detained beyond 14 days. RCW 71.05.310. ES would not receive these procedural protections until she had been involuntarily detained for over a month.

Accordingly, we hold that hospital staff violated the requirements of the involuntary treatment act when they dropped the 14-day hold early for the sole purpose of reinitiating an emergency detention, especially where ES was not notified of the release. Because there is no support in the record for the finding that the two involuntary commitments were separated by a break in ES's actual detention, the superior court's finding that the detentions were "not

19

No. 55426-7-II

continuous" was erroneous. CP at 72.[1] To hold otherwise would lead to the absurd result that staff could detain involuntarily committed persons indefinitely by simply dropping and reinitiating detentions under new cause numbers—without ever providing the committed person with opportunities for release or more substantial review.

Even so, we recently held in *N.G.* that although dismissal is an available remedy for an involuntary treatment act violation, the court should dismiss a petition only where the petitioners totally disregarded the act's requirements. 20 Wn. App. 2d at 831.

### III. MOTION TO DISMISS AND ORDER GRANTING SECOND 14-DAY PETITION

ES argues the superior court erred by denying her motion to dismiss and granting the second 14-day commitment petition because hospital staff totally disregarded the involuntary treatment act's requirements. She further argues that a constitutional due process violation "arose from the State's failure to adequately comply with the statutory procedures" in this particular case. Reply Br. of Appellant at 13. We agree that hospital staff totally disregarded the involuntary treatment act's requirements, warranting dismissal of the second 14-day commitment order.

A.  The Total Disregard Standard

Both the Washington Supreme Court and the United States Supreme Court have recognized that involuntary commitment is "a significant deprivation of liberty that requires due process protection." *In re Det. of McLaughlin*, 100 Wn.2d 832, 838, 676 P.2d 444 (1984) (citing *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979); *Humphrey v. Cady*, 405 U.S.

---

[1] Although the superior court labeled this finding as a conclusion of law, "we treat statements incorrectly labeled as conclusions of law as findings of fact." *State v. Bass*, 18 Wn. App. 2d 760, 777 n.3, 491 P.3d 988 (2021), *review denied*, 198 Wn.2d 1034 (2022).

No. 55426-7-II

504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972)). In Washington, courts have viewed the provisions of the involuntary treatment act as a "framework for determining the appropriate due process guaranties applicable" to specific detention proceedings. *Id.* Under the provisions of the act, "a person subject to commitment receives ever-increasing procedural rights as the commitment duration lengthens." *A.S.*, 138 Wn.2d at 911.

"When construing the requirements of this chapter," the legislature has specified that courts "must focus on the merits of the petition, except where requirements have been totally disregarded." RCW 71.05.010(2). "A presumption in favor of deciding petitions on their merits furthers both public and private interests because the mental and physical well-being of individuals as well as public safety may be implicated by the decision to release an individual and discontinue [their] treatment." *Id.* And "allowing dismissal in cases where the professional staff totally disregarded the statutory requirements serves as a general safeguard against abuse." *C.W.*, 147 Wn.2d at 283.

Although the legislature did not define "totally disregard" within the involuntary treatment act, this court recently held that the superior court must consider the totality of the circumstances in light of four specific factors:

> (1) [W]hether the violation of the statutory requirements occurred knowingly, willfully or through gross negligence; (2) the extent of the deprivation of the committed person's liberty; (3) the extent to which the petitioner's conduct and the committed person's requested remedy are protective of the committed person's health and safety and reflect appropriate treatment for the committed person; and (4) the extent to which the petitioner's conduct and the committed person's requested remedy are protective of the safety of the public.

*N.G.*, 20 Wn. App. 2d at 837.

No. 55426-7-II

The total disregard determination is a factual one, and the weight given to each of the factors depends on the facts of each case. *Id.* Because all four factors must be considered, a knowing or willful violation of the act's requirements will not automatically constitute a total disregard of those requirements. *Id.* at 835. The longer the unlawful detention, the more likely the requirements have been totally disregarded; "a de minimis detention will be unlikely to rise to the level of total disregard." *Id.* at 836. And if the petitioner's conduct is protective of the committed person's health and safety or the public's safety, that "may mitigate an [involuntary treatment act] violation." *Id.* We review the superior court's total disregard determination for abuse of discretion. *Id.* at 837.

We have previously held that the requirements of the involuntary treatment act were totally disregarded where a statutory provision "explicitly require[d]" the designated mental health professional petitioning for involuntary commitment to consult with an examining emergency room physician on whether detention was appropriate and the mental health professional failed to do so. *In re Det. of K.R.*, 195 Wn. App. 843, 847, 381 P.3d 158 (2016). We rejected the State's argument that a violation of this statutory mandate was a "'technical irregularity.'" *Id.*

In contrast, we have held that petitioners did not totally disregard the involuntary treatment act requirements where an evaluation and treatment facility sought two successive 72-hour detentions. *See D.H.*, 20 Wn. App. 2d at 846-47. In *D.H.*, the facility violated the then-statutory requirement to release a person who had been detained for 72 hours where there was no valid court order authorizing continued detention or agreement to receive further treatment voluntarily. *Id.* at 847 (citing former RCW 71.05.210(1)(b) (2019)). However, the facility in *D.H.* did not *willfully* violate this statutory requirement; DH initially agreed to treatment voluntarily, "but then he

22

No. 55426-7-II

demanded to leave after it was too late" to file a timely 14-day petition. *Id.* at 850. Additionally, the "resulting improper deprivation of liberty was relatively minimal," and releasing DH would have "created a significant risk to public safety," especially to his mother whom he had threatened to kill. *Id.* Accordingly, the superior court did not err in denying DH's motion to dismiss a subsequent 14-day petition for total disregard under the facts of that case. *Id.*

B.      Applying this Standard to the Procedures Used to Detain ES

Here, hospital staff knowingly missed the statutory deadline to file the 90-day petition by January 3, 2021. When the attending physician refused to sign the petition on December 31, 2020, hospital staff had several options. First, the petition could have been signed by another physician, a physician assistant, a psychiatric advanced registered nurse practitioner, or a mental health professional. RCW 71.05.290(2)(a)(i)(A)-(B); *see also A.S.*, 138 Wn.2d at 913 (summoning another physician from Seattle when the attending physician was not able to sign due to illness). But staff did not pursue a signature from a different medical or mental health professional. It is also not clear from the record that staff fully explained the situation to the attending physician who refused to sign.

Alternatively, RCW 71.05.210(3) allows the superior court to grant a 14-day continuance where the committed person was hospitalized to receive medical care. Staff never sought such a continuance.[2] And RCW 71.05.260(2)(a) allows for a committed person to receive treatment

---

[2] The State characterizes ES's detention status as ambiguous because she was transferred to Tacoma General and, under RCW 71.05.210(3), if an involuntarily committed person is transferred to the hospital, "the court shall order such continuance in proceedings under this chapter as may be necessary, but in no event may this continuance be more than fourteen days." The superior court never ordered a continuance based on ES's hospitalization. The mere existence of this statutory

23

No. 55426-7-II

beyond 14 days where they have agreed to receive further treatment voluntarily. Yet, the record does not show that staff asked ES whether she would be willing to receive further treatment voluntarily before reinitiating emergency detention under a new cause number. Finally, there is no evidence in the record showing that once ES was legally entitled to release, hospital staff explored and ruled out the option of ES returning to the residential care facility where she had previously lived.

Unlike in *N.G.*, where an unreliable computer system caused detention orders to expire without notice to staff, the staff here were aware of the approaching deadline, and an attending physician refused to sign a new commitment petition *before* the existing one expired. And unlike in *D.H.*, where DH suddenly changed his mind about his willingness to remain in a treatment facility voluntarily, ES was not responsible for any difficulties that staff faced in complying with the act. She was never given the opportunity to leave or to receive further treatment voluntarily. Staff were aware of the statutory requirements for detention beyond 14 days, and they failed to comply with those requirements. Moreover, the designated crisis responder's delay of several hours constituted a further violation of the act's requirements after ES's procedural protections had already been compromised.

Opting for a path that violated ES's statutory rights, rather than exploring and fully ruling out the alternatives described above, amounted to a knowing and willful violation of the act. This weighs heavily in favor of total disregard.

---

authority does not make the status of ES's detention ambiguous. Nor does it make the hospital's violation of the involuntary treatment act's requirements less knowing.

No. 55426-7-II

Second, we must consider the extent of the deprivation of ES's liberty. As discussed above, ES was detained under the 2021 cause number between January 5 and February 10, 2021, when the 90-day petition was ultimately dismissed. She was detained without the escalated procedural safeguards to which she was entitled for over a month. In total, ES was involuntarily committed for at least 50 days. During that time, she was never given an opportunity to request a jury trial, and petitioners were never required to show that her detention was warranted by clear, cogent, and convincing evidence. Instead, ES experienced one prolonged detention, supported only by a preponderance of the evidence, that now appears as two involuntary commitments in her records—a fact that could have "adverse consequences on future involuntary commitment determinations," should they occur. *M.K.*, 168 Wn. App. at 625. This was not a de minimis deprivation.

The State argues ES "was afforded reasonable due process" because two 14-day detentions involve "less than a third of the time of a 90-day detention." Br. of Resp't at 36. But contrary to the State's argument attempting to minimize the deprivation of liberty, ES's claim that she is entitled to greater procedural protections for *any* detention beyond 14 days is grounded in statutory language. Pursuant to RCW 71.05.240(6), "if involuntary treatment is sought *beyond* the fourteen-day inpatient . . . treatment period, the person has the right to a full hearing or jury trial." (Emphasis added.) *See* CP at 34 (using similar language in ES's 14-day commitment order under the 2020 cause number). The superior court may then remand the person to a facility "for a further period of intensive treatment *not to exceed* ninety days from the date of judgment." RCW 71.05.320(1)(a) (emphasis added). The legislature has articulated that greater procedural protections are appropriate when a person may be involuntarily committed for *any* period of time between 14 and 90 days.

25

No. 55426-7-II

As for the third factor, a statutory violation may be mitigated where the petitioner's conduct is aimed at protecting the committed person's health and safety. The record here shows that ES was not able to complete activities of daily living, such as using the toilet independently or allowing nursing staff to change her when she soiled herself. Petitioners believed she continued to be gravely disabled. However, the State has not shown on this record that ES would have been released without any place to go or people to look after her. The administrator of the residential care facility where she had previously lived testified that the facility saved a bed for ES to return. There is no evidence in this record that hospital staff explored ES returning to the residential care facility as an alternative to violating her statutory rights. Thus, there is some mitigation of the statutory violations under this factor, but not strong mitigation.

The fourth factor recognizes that a statutory violation may be mitigated where it was protective of public safety. There were founded concerns about ES's aggressive behavior, including that she could be hostile and assaultive toward caregivers. But this behavior did not rise to the level of risk to the public sometimes seen in involuntary commitment cases. *See, e.g.*, *D.H.*, 20 Wn. App. 2d at 844 ("DH showed symptoms of delusions and said that he was going to kill his mother because she was an imposter."); *In re Det. of A.M.*, 17 Wn. App. 2d 321, 324, 487 P.3d 531 (2021) ("AM was arrested after telling a grocery checker that he was 'going to get a gun and shoot [her] in the face.'" (alteration in original)). ES was a small, 70-year-old woman who was prone to yelling, cursing, and throwing items from her room. The absence of a showing that ES presented a true danger to the public is significant in this case. And again, the State did not show that its only option compliant with the involuntary treatment act would have been to release ES

26

No. 55426-7-II

without any care or supervision. If she had been able to return to the residential care facility, she would have received the support of the psychiatrist and mental health professional on staff there.

We recognize the statutory presumption in favor of deciding commitment petitions on the merits. A decision to dismiss a petition and release a person may implicate "the mental and physical well-being of individuals as well as public safety," and that is not to be taken lightly. RCW 71.05.010(2). But dismissal must also be a truly available remedy where the requirements have been totally disregarded if it is ever to "safeguard against abuse." *C.W.*, 147 Wn.2d at 283. If staff may remedy their statutory violations by simply trying again under a new cause number in all circumstances, the statutory protections against abuse of the involuntary commitment process will be significantly eroded.

In sum, after hospital staff knowingly missed the statutory deadline for further detention, they knowingly and willfully violated the involuntary treatment act's procedural requirements in order to keep ES detained, and they either ignored or failed to explore alternatives that would have complied with the act. ES was never notified when she was legally entitled to release, she was involuntarily detained under a new cause number—without the procedural protections that the legislature intended—for over a month, and her single period of detention resulted in two separate involuntary commitments appearing on her records, which could weigh against her in future proceedings. ES required assistance with activities of daily living and exhibited aggression toward nursing staff, but alternatives could have mitigated the risk of harm to ES and the public and still complied with the law.

Applying the *N.G.* factors and considering the totality of the circumstances, we conclude that hospital staff totally disregarded the involuntary treatment act's procedural requirements. We

27

No. 55426-7-II

reverse ES's second 14-day commitment order because the petition should have been dismissed in the first instance.

Because we resolve this case on statutory grounds, we need not reach ES's constitutional arguments. Nevertheless, we briefly reject any suggestion that a detention is inherently "legitimate" whenever it is "pursued in Respondent's best interest, and the interests of the community." Br. of Resp't at 38. A detention is not rendered legitimate solely because staff believed they were acting in the best interest of the committed person or the community. We recognize that the State has an interest in "protecting the community" and "providing care to those who are unable to care for themselves," but "it is also clear that mental illness alone is not a constitutionally adequate basis for involuntary commitment." *In re Det. of LaBelle*, 107 Wn.2d 196, 201, 728 P.2d 138 (1986). The State's interest cannot overshadow an individual's interest in being protected from deprivations of liberty without due process. "The most formidable abridgment of due process guarantees . . . occurs where 'lip service' is paid to certain rights of the accused as a mere formality, with the consequence that any substantive protection is woefully lacking." *In re Quesnell*, 83 Wn.2d 224, 233-34, 517 P.2d 568 (1973).

CONCLUSION

We reaffirm our holding that dismissal is an available remedy where staff reinitiate involuntary commitment under a new cause number to avoid the consequences of their noncompliance with the involuntary treatment act. We further hold that, under the facts of this case, the State totally disregarded the act's requirements. Accordingly, the superior court erred when it denied ES's motion to dismiss the second 14-day commitment petition. We reverse the

28

No. 55426-7-II

superior court's order denying ES's motion to dismiss and remand for the superior court to vacate

ES's second 14-day commitment order.

Glasgow, C.J.

We concur:

Veljacic, J.

Price, J.