# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>C.O.D.,<br><br>               Appellant. | No. 86014-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — C.O.D. appeals the trial court's order involuntarily committing him for 14 days of treatment under the Involuntary Treatment Act (ITA), ch. 71.05 RCW.[1] C.O.D. argues that the trial court erred in finding him gravely disabled and that he presented a likelihood of serious harm to himself. We affirm.[2]

I

On October 25, 2023, C.O.D. went to the MultiCare Auburn to have cuts on his wrist evaluated after reporting that he cut himself when having a rush of emotions. While in the emergency room, C.O.D. told the social worker that this was a one-time

---

[1] Involuntary civil commitment cases are not moot on appeal even after the commitment period has ended because such commitments may constitute evidence in later proceedings. See In re Det. of M.K., 168 Wn. App. 621, 629, 279 P.3d 897 (2012); RCW 71.05.245(3). The State does not argue otherwise.

[2] C.O.D. asks that we disregard the State's brief because it omits citations to the record throughout the argument section. While we agree with C.O.D. that the State's brief fails to cite the record as required by RAP 10.3(a)(6), there is substantial evidence in the record to support the trial court's findings.

incident, and he would try alternative coping mechanisms if he felt overwhelmed again. The social worker determined that C.O.D. did not meet the criteria for involuntary commitment and he was discharged.

On October 27, 2023, C.O.D. was brought to the emergency department by his family with concerns of psychiatric problems. C.O.D.'s brother, J.D., spoke to a designated crisis responder (DCR) and stated that C.O.D.'s mental health had gotten worse over the last week. J.D. told the DCR that C.O.D. called him a few days before and asked him to buy him a gun. When the MultiCare social worker spoke to C.O.D., he admitted having asked his brother to buy a gun and admitted that if he had got a gun he would have probably done something to himself. But C.O.D. denied any mental health concerns and refused offers for less restrictive treatment.

The DCR spoke to C.O.D. and observed him to have a flat affect, blank stare, and rapid speech. C.O.D. admitted to the DCR that when he cut himself it was a suicide attempt. However, C.O.D. told the DCR that he did not have any mental health issues and did not believe he needed any help. The DCR petitioned for initial detention. C.O.D. was transferred to Fairfax Hospital on October 29.

Following C.O.D.'s initial detention, Fairfax petitioned for 14 days of involuntary treatment. Fairfax asserted that C.O.D. was suffering from a behavioral health disorder and that C.O.D. was gravely disabled as well as posed a substantial likelihood of harm to himself.

At the 14-day involuntary treatment hearing, J.D. testified to the changes in C.O.D. over the last year. J.D. stated that C.O.D. used to be very social and active.

C.O.D. also had a job at Taco Bell but lost it after taking a mental health break. J.D. testified that C.O.D. started self-isolating and that his hygiene worsened.

J.D. testified that in early October 2023, C.O.D. texted in a group message that their mother was a witch and one of their brothers was a warlock. C.O.D. continued stating that his brothers needed to be careful and that there was bad energy everywhere.

J.D. testified that around 1 p.m. on October 25, 2023, C.O.D. called him and asked if he could buy him a gun. J.D. rushed to C.O.D.'s house and when J.D. arrived, all the lights were off, and C.O.D. was sitting at the table with a blank expression. While J.D. tried to talk to him, C.O.D. rolled up his sleeves exposing cuts on his left wrist. J.D. testified that C.O.D. then went upstairs to change clothes and could not find anything to wear because he said he could not wear certain colors. C.O.D. eventually put on an orange sweater as pants, without any underwear or socks. C.O.D. then asked J.D. to shave all the hair off his body. J.D. declined but C.O.D. proceeded to shave all the hair off of his head and his eyebrows because the color black had bad energy.

J.D. testified he then called Auburn Police Department because he was concerned about C.O.D. But when the police arrived, C.O.D. ran away in the cold rain wearing the orange sweater as pants and no shoes. J.D. and the police eventually lost sight of C.O.D.

J.D. testified that C.O.D. returned home around 4 a.m. the next morning. C.O.D. never told J.D. where he had been. Late on October 26, J.D. received concerning messages from his family regarding C.O.D.'s behavior, so he rushed over to C.O.D.'s house. When J.D. arrived, C.O.D. was walking up and down the stairs not speaking or

-3-

responding to anyone talking to him. After about an hour, C.O.D.'s family convinced him to go to the hospital. A social worker met them outside the emergency department and began talking to C.O.D. After speaking to the social worker, C.O.D. attempted to run away from the hospital.

Susan Suardez, the record custodian for MultiCare, testified that the hospital performed a urinalysis culture which indicated 150 ketones. The reference range is negative ketones, so 150 ketones indicated malnutrition and dehydration. Suardez testified that during the first few days at the hospital, C.O.D. declined several meals despite the hospital's attempt to accommodate his dietary preferences.

Brian Hayden, a court evaluator for King and Snohomish County, interviewed C.O.D. while he was at Fairfax. He testified that C.O.D. had a working diagnosis of unspecified schizophrenia spectrum disorder due to his symptoms of flat affect, preoccupation, impaired impulse control, racing thoughts, and delusional content. He testified this disorder renders him gravely disabled and a substantial risk of harm to himself. Hayden testified to his concerns with C.O.D.'s eating habits, high ketones, lack of insight into his health, and his suicide ideation.

Hayden also testified that during an evaluation at Fairfax, C.O.D. expressed that the suicide thoughts were a one-time thing and that he did not like taking the medication, but he worried it would count against him if he did not take it. C.O.D. repeatedly asked what he needed to do to make the hospital stay short because he did not think he needed an evaluation or help.

The trial court found by a preponderance of evidence that C.O.D. suffers from a behavioral health disorder that rendered him gravely disabled under prong (a) and (b) and that he presented a substantial likelihood of harm to himself. C.O.D. appeals.

II

The ITA authorizes courts to commit an individual for up to 14 days if, by a preponderance of the evidence, the petitioner proves that such person, "as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled." RCW 71.05.240(4)(a). The State's authority to commit people under the ITA is "strictly limited." In re Det. of D.W., 181 Wn.2d 201, 207, 332 P.3d 423 (2014). The court must consider less restrictive alternatives, but if it finds that none are sufficient, the ITA dictates that the court must order the individual be detained to a licensed treatment facility. RCW 71.05.240(4)(a). Involuntary commitment impacts liberty interests, thus, courts must strictly construe the statutes regulating these proceedings. D.W., 181 Wn.2d at 207.

On review, we determine whether substantial evidence supports the trial court's findings and, if so, whether those findings support its conclusions of law and judgment. In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998), aff'd, 138 Wn.2d 898, 982 P.2d 1156 (1999). "Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise." Brown v. Superior Underwriters, 30 Wn. App. 303, 306, 632 P.2d 887 (1980).

We review challenges to the sufficiency of the evidence in the light most favorable to the State. In re Det. of B.M., 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).

And we do not disturb the trial court's assessment of witness credibility or the persuasiveness of the evidence. In re Vulnerable Adult Petition for Knight, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014).

A

C.O.D. argues that there was insufficient evidence to support the trial court's finding that he was "gravely disabled." We disagree.

RCW 71.05.020(25) defines "gravely disabled" as:

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

The trial court found that C.O.D. was gravely disabled under both prong (a) and prong (b) of the definition. C.O.D. challenges both findings. We address each in turn.

1

Prong (a) requires "a showing of a substantial risk of danger of serious physical harm resulting from failure to provide for essential health and safety needs." In re Det. of LaBelle, 107 Wn.2d 196, 204, 728 P.2d 138 (1986). "The State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." LaBelle, 107 Wn.2d at 204-05. The State must show that the person's mental condition "render[s] [the person] unable to make a rational choice with respect to [their] ability to care for [their] essential needs." LaBelle, 107 Wn.2d at 210.

There was sufficient evidence to support the trial court's finding that C.O.D. was in danger of serious physical harm resulting from a failure to provide for his essential needs. RCW 71.05.020(25)(a). The trial court's written findings provide:

> The court finds by a preponderance of the evidence that the Respondent is in danger of serious physical harm from a failure or inability to provide for his essential needs of health and safety. The court heard testimony that the Respondent has not been eating appropriately due to beliefs about the something being wrong about the shape or color of foods. The court heard testimony that the Respondent refused hydration due to concerns about contamination, and presented with a high level of ketones in his system. While the court heard testimony that the Respondent has struggled with weight issues and is trying to make healthier diet choices, the court finds the Respondent's inability to meet his needs for food is due to a mental health disorder and not related to diet choices. The court also heard testimony that the Respondent was not clothing himself appropriately—he was observed wearing only a sweater on top with a sweater threaded through his legs and no shoes while running in the rain. The court heard testimony the Respondent's behavior caused sores to his feet because he only had on socks.

C.O.D. first argues that the evidence did not prove that he was gravely disabled because C.O.D.'s weight loss brought him to a healthy BMI and that alone cannot be evidence of a substantial risk of serious harm.

Substantial evidence supports the trial court's finding that C.O.D.'s weight loss was related to a mental health disorder. While C.O.D.'s weight loss brought him to a healthy weight, the evidence shows that his weight loss was due to fasting and refusing to eat foods of particular shapes and sizes, not motivated by health. Additionally, C.O.D.'s urinalysis showed malnutrition and dehydration. Further, in the days leading up to his hospitalization, J.D. noticed that he was not eating or drinking, and the hospital records illustrated that C.O.D. refused water and meals when he arrived to the hospital.

C.O.D. argues that the holding in In re Detention of A.M., 17 Wn. App. 2d 321, 487 P.3d 531 (2021) is instructive. In the case, A.M. refused to eat and only ate

intermittently for the weeks leading up to the hearing because he believed he had "some sort of intestinal problem." A.M., 17 Wn. App. 2d at 333-34. The court found that the evidence demonstrated that A.M. failed to provide for his essential human needs. A.M., 17 Wn. App. 2d at 334. But the court found that prong (a) was not met because the failure to meet his needs did not put him in danger of "serious physical harm" because there was no evidence of "past or recent weight loss or any other health consequence" from A.M.'s reluctance to eat. A.M., 17 Wn. App. 2d at 334. C.O.D. argues that, like in A.M., C.O.D. was not in any danger from his unusual eating habits.

Substantial evidence demonstrates that C.O.D.'s inability to provide for his essential human needs put him in serious danger, unlike in A.M., C.O.D. arrived to the hospital malnourished and dehydrated. The reference range for ketones is negative. C.O.D. presented with 150 ketones. Further, the record shows that C.O.D. lost significant weight over the last year due to fasting and refusal to eat certain foods. Therefore, unlike A.M., C.O.D. was in danger of serious physical harm because of the evidence of weight loss and high level of ketones.

Next, C.O.D. argues that his choice of clothing did not pose a risk of serious physical harm because it was only one time.[3] The trial court's findings about C.O.D.'s failure to dress appropriately for cold, rainy weather is also supported by substantial evidence. After his brother called the police, C.O.D. ran out of the house into the rain wearing an orange sweater as pants without underwear or shoes. While the record

_____

[3] C.O.D. argues that his failure to dress himself appropriately is "far from the type of serious physical harm" that the court has contemplated in other cases like In re Detention of R.H., 178 Wn. App. 941, 316 P.3d 535 (2014). But, this distinction is irrelevant to our analysis. Viewing the record as whole, substantial evidence supported the trial judge's finding that C.O.D. was in danger of serious physical harm due to inability to provide for his essential needs of health and safety.

shows that C.O.D. was observed only this one time dressed like this, it was in the days leading up to his hospitalization. Moreover, his failure to dress appropriately resulted in sores and blisters on his feet. Lastly, this occurrence was not the only basis for the trial court's finding that C.O.D. was gravely disabled under prong (a).

The trial court's finding that C.O.D. is gravely disabled under RCW 71.05.020(25)(a) is supported by substantial evidence.

2

When alleging grave disability under prong (b) of RCW 71.05.020(25), the State must show "recent proof of significant loss of cognitive or volitional control." LaBelle, 107 Wn.2d at 208. And there must be proof that the individual "is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." LaBelle, 107 Wn.2d at 208.

Substantial evidence supports that C.O.D.'s deterioration was recent. J.D. testified that as recently as a year before C.O.D. had always been really well dressed, with nice shoes and good clothing. C.O.D. also showered often and brushed his teeth regularly. J.D. also testified that a year before, C.O.D. liked to go out to eat with J.D. and others, and that they had hobbies and played online games. But leading up to the events of late October, J.D. testified that C.O.D. had stopped brushing his teeth and keeping himself groomed. And C.O.D. had largely stopped going out except alone and stopped reaching out to do activities such as play online games. The evidence demonstrated that C.O.D.'s symptoms increased in the month leading up to the hearing and particularly the days before he was hospitalized. Indeed, the majority of the records concerns the events from October 25 to October 27. Although evidence showed that

C.O.D.'s behavior had changed over the last year, the most concerning changes occurred in the month and days leading up to the hearing. Thus, C.O.D.'s argument that his deterioration was not recent fails.

There was also substantial evidence that C.O.D.'s deterioration was severe. C.O.D. argues that his deterioration was not severe because he maintained a basic level of health and safety, he presented himself to the hospital willingly, and he never stated he would not take medication if released. But the evidence illustrated the contrary. C.O.D. was malnourished and dehydrated, attempted to run away from the hospital, and stated he took medicine just so he could get released. Lastly, while hospitalized, C.O.D. continuously failed to acknowledge his health or his need for treatment. Substantial evidence demonstrated that C.O.D. lacked the ability to make rational choices about his health following discharge from the hospital.

The trial court's finding that C.O.D. was gravely disabled under RCW 71.05.020(25)(b) is supported by substantial evidence.

B

C.O.D. argues that substantial evidence does not support the finding that he was a substantial risk of harm to himself because the trial court misunderstood the timeline. C.O.D. argues that there must have been scrivener's error in the hospital records on which date he went to the hospital because C.O.D. claims that he cut himself and asked for a gun, and then he went to the hospital for the first time. C.O.D. argues because the timeline was incorrect, the trial court's finding is not supported by substantial evidence. We disagree.

"Likelihood of serious harm" to oneself is defined as a "substantial risk that . . . [p]hysical harm will be inflicted by a person upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself." RCW 71.05.020(37)(a).

The trial court's finding that C.O.D. was a substantial risk of harm to himself is supported by substantial evidence.

J.D. testified that he received a call from C.O.D. on October 25 around 1 p.m. asking for a gun. He arrived and saw C.O.D. had cuts on his arm that appeared fresh. C.O.D. ran away that night and C.O.D. testified that he did not know where he went. Nothing in the record indicates where C.O.D. went on the night October 25 and the early hours of the 26th. J.D. testified that the next time he spoke to C.O.D. was "that same day" that he returned after running away, the 26th. This testimony refutes C.O.D.'s assertion that there must be scrivener's error because the record makes clear the timeline—C.O.D. was admitted to the hospital in the early hours of October 25, and later that day at 1 p.m. he asked J.D. for a gun, C.O.D. then ran away, and after C.O.D. returned home, his family convinced him to go to the hospital in the early hours of the October 27.

C.O.D. relies on the report from the MultiCare DCR who stated that C.O.D.'s family believed that he went to the hospital because he came home in "spice scrubs" after he ran away. But this version of events is not supported by testimony at the hearing.

Even if the trial court had the timeline of events wrong, there is still substantial evidence to support the finding that C.O.D. presented a likelihood of serious harm to

himself. Within only a few days, C.O.D. cut his own left wrist, asked his brother for a gun, attempted to run away from the hospital, and admitted to suicide ideation and plans to use the gun. Further, the trial judge had a sufficient basis under both prong (a) and prong (b) for involuntary confinement, and a different timeline of events would not have changed that outcome.

Reviewing the record as a whole, the trial court's findings for C.O.D.'s 14-day involuntary commitment are supported by substantial evidence.

Affirmed.

Mann, J.

WE CONCUR:

Chung, J.          Coburn, J.