**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Detention of<br><br>K.H.,<br><br>　　　　　　Appellant. | No. 87351-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — K.H. appeals the trial court's order involuntarily committing her for 14 days of treatment under the Involuntary Treatment Act (ITA), ch. 71.05 RCW. K.H. argues that the trial court erred in finding her gravely disabled due to a mental disorder rather than substance abuse. Because substantial evidence supports the court's conclusion that K.H. is gravely disabled under RCW 71.05.020(25)(a) and (b), we affirm.

I

On October 9, 2024, K.H.'s mother brought her to the emergency department at Valley Medical Center (Valley Medical) in Renton. K.H. requested antibiotics for a cut on the middle finger of her right hand that she believed had become infected. K.H. presented as lethargic, disorganized, disoriented, tangential, and at times nonsensical. K.H. said that she had used cocaine two days before, methamphetamine a day before, and that she had also inadvertently ingested fentanyl. K.H. tested positive for those substances.

On October 10, 2024, K.H. was taken from Valley Medical to Fairfax Hospital in Kirkland (Fairfax).

On October 15, 2024, Fairfax petitioned to keep K.H. at the facility for another 14 days of involuntary treatment under RCW 71.05.240. Fairfax asserted that K.H. was gravely disabled due to a mental disorder and was in danger of serious physical harm. RCW 71.05.230(1). Fairfax also stated that during her time at the facility, K.H. appeared isolated, kept expressing tangential thoughts, and exhibited disorientation and poor insight and judgment about her symptoms. Fairfax concluded that K.H. required "the monitoring and stabilization of an inpatient psychiatric hospital," and that there were no less restrictive alternatives available.

A hearing on the 14-day commitment petition took place on October 16, 2024. K.H.'s mother, Carolyn Johnson, testified that K.H. had lived in her own home for about eight years, and that she checked on K.H. every two or three days. She also testified that she had visited K.H. at her home a week before and found her sitting on her bed in the middle of a mess. There were trash, clothes, food, random tools, and garbage all over K.H.'s entire home, not only in her bedroom. Johnson testified that K.H.'s bathroom was unusable; the toilet was full of rocks, urine, and feces. Johnson also stated that she observed damage to doors and cabinets, holes all over the walls, and found clothes inside the refrigerator's freezer in the kitchen.

Johnson also testified that in January 2024, she thought that K.H. was in a psychotic state of mind, and that she was not acting like herself. K.H. went to Johnson's house and was upset at the efforts Johnson was making to get her assistance. K.H. demanded money from her. When Johnson did not give her the

money, K.H. jumped on her, causing Johnson to have a concussion, split lip, and a black eye.

Johnson continued her testimony by stating that K.H. had been on medication in the past to help address her mental health issues. In 2023, K.H. left Navos Behavioral Health Hospital and stayed at Johnson's home for a brief period. During that time, while she was taking her medication, K.H.'s level of communication was good, she respected Johnson's space, did not hoard or have violent outbursts, and Johnson was even trying to register K.H. at Highline Community College.

Johnson further stated that she feared for K.H.'s safety if she were allowed to leave Fairfax. Johnson stated that K.H. would not have had a home to go back to because it was destroyed and boarded up. Johnson testified that she did not know if or how K.H. was getting financial assistance, and that the only time K.H. communicated with her in recent times was when she asked Johnson to take her to the hospital.

Hyemin Song, the records custodian for Valley Medical, testified that during K.H.'s visit to the emergency room she appeared disorganized and expressed paranoid thoughts. K.H.'s labs showed slight hypoglycemia and slightly low levels of potassium, for which she was given food and potassium. Additionally, a drug screen came back positive for amphetamines, cocaine, and fentanyl. After K.H. was medically cleared, she was referred to an emergency department (ED) crisis counselor for an evaluation.

Song testified that the ED counselor observed K.H. as calm and elusive, and not properly engaging with what she was being asked. Further, K.H. appeared disoriented and displayed psychotic features, such as lack of motivation, restricted affect, and lethargy. While K.H. did not endorse any suicidal or homicidal ideations and had no

reports of self-harm or harm to others, Song testified that K.H. exhibited little insight into the severity of her behavioral health symptoms and the consequences of her continued behavior.

Laura Yen, a court evaluator, testified that she tried to interview K.H. while she was at Fairfax, but K.H. declined and said that she preferred if her attorney were present. Yen then stated that because the 14-day involuntary treatment hearing was to take place soon that same day, she did not have a second chance to try to interview K.H. Nonetheless, Yen testified that, in her opinion, K.H. suffered from a behavioral health disorder. Yen's working diagnosis for K.H. was schizoaffective disorder of a bipolar type due to experiencing delusions, responding to internal stimuli, and exhibiting internal and external preoccupation. Yen also stated that K.H. presented a labile affect, as well as some agitation and behavior that was beyond what would be considered normal for someone whose mood is stable.

Yen further testified that K.H.'s disorder has a substantial adverse effect on her cognitive and volitional function, thus rendering her gravely disabled and in danger of serious physical harm from a failure or inability to provide for her essential health and safety needs.

Yen continued her testimony by stating that during several evaluations by nurse practitioners and a psychiatrist at Fairfax, K.H. presented as guarded, uncooperative, minimally interactive, irritable, and isolated. Further, K.H.'s eye contact and appearance were poor, she exhibited poverty of thought, and her insight and judgment were impaired. During some of her evaluations, K.H. experienced hallucinations. K.H. accused Fairfax of selling her home and "making money by selling pills," and on the

morning of the 14-day commitment hearing, also reported to Fairfax staff that voices were telling her that "someone is going to attack her family." Lastly, Yen testified that to the extent that K.H. had exhibited any improvement, it was possible to attribute it to medication and the hospital setting at Fairfax.

The trial court found by a preponderance of the evidence that K.H. suffers from a behavioral health disorder that rendered her gravely disabled under prongs (a) and (b) of RCW 71.05.020(25), that she was in danger of serious physical harm resulting from a failure to provide for her essential health and safety needs, and that no less restrictive alternative was available because K.H. was still symptomatic.

K.H. appeals.

II

The ITA authorizes courts to commit an individual for up to 14 days if, by a preponderance of the evidence, the petitioner proves that such a person, "as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled." RCW 71.05.240(4)(a). The State's authority to commit people under the ITA is "strictly limited." In re Det. of D.W., 181 Wn.2d 201, 207, 332 P.3d 423 (2014). Said differently, because involuntary commitment impacts liberty interests, courts must strictly construe the statutes governing those proceedings. D.W., 181 Wn.2d at 207. Further, courts must consider less restrictive alternatives, but if they find that none are sufficient, the ITA dictates that courts order the individual be detained for involuntary treatment in a facility licensed or certified to provide treatment. RCW 71.05.240(4)(a).

On review, we determine whether substantial evidence supports the trial court's findings, and if so, whether those findings support its conclusions of law and judgment.

In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998), aff'd, 138 Wn.2d 898, 982 P.2d 1156 (1999). Substantial evidence is evidence sufficient to persuade a rational, fair-minded person of the asserted premise. A.S., 91 Wn. App. at 162.

We review challenges to the sufficiency of the evidence in the light most favorable to the State. In re Det. of B.M., 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019). And we do not disturb the trial court's assessment of witness credibility, conflicting testimony, and the persuasiveness of the evidence. In re Vulnerable Adult Petition for Knight, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014).

A

K.H. argues that there was insufficient evidence to support the trial court's finding that she was "gravely disabled." K.H. asserts that the State failed to prove that a mental disorder rather than substance abuse caused her behavior and presentation, including her home's condition. We disagree.

RCW 71.05.020(25) defines "gravely disabled" as

a condition in which a person, as a result of a behavioral health disorder:
(a) Is in danger of serious physical harm resulting from a failure to provide
for his or her essential human needs of health or safety; or (b) manifests
severe deterioration in routine functioning evidenced by repeated and
escalating loss of cognitive or volitional control over his or her actions and
is not receiving such care as is essential for his or her health or safety.

The trial court found that K.H. was gravely disabled under both subsections (a) and (b) of the statute. K.H. challenges both findings. We address each in turn.

1

The "gravely disabled" standard under RCW 71.05.020(25)(a) requires "a showing of a substantial risk of danger of serious physical harm resulting from failure to

provide for essential health and safety needs." In re Det. of LaBelle, 107 Wn.2d 196, 204, 728 P.2d 138 (1986). The "State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." LaBelle, 107 Wn.2d at 204-05. Lastly, the State must show that the person's mental condition "render[s the person] unable to make a rational choice with respect to [their] ability to care for [their] essential needs." LaBelle, 107 Wn.2d at 210.

The trial court's written findings state:

> The court found [by] a preponderance of the evidence that [K.H.] is in danger of serious physical harm from a failure or inability to provide for her essential needs of health and safety because of her behavioral disorder, specifically referencing a loss of housing that flows directly from [K.H.'s] symptoms of disorganization. [K.H.] was living in a home without a functioning toilet or refrigerator/freezer. Additionally, the home was littered with rotten food, trash, clothing and items placed inappropriately.

K.H. asserts that the trial court relied too heavily on her home's condition in finding that she was at risk of physical harm and argues that its poor condition was just as likely due to K.H.'s drug use and the presence of undesirable people as it was because of her mental disorder. In opposition, the State argues that the record establishes that K.H. continued to display symptoms of psychosis until the time of her hearing, and that K.H. had been prevented from accessing illicit substances in the interim. Thus, the State asserts, K.H.'s continued existence of psychiatric symptoms after metabolizing any illicit substances consumed before going to the hospital can be attributed to an underlying behavioral health disorder, even if those symptoms were exacerbated by drug use before her admission. We agree with the State.

At the 14-day commitment hearing, court evaluator Yen testified that K.H.'s living situation indicated that she was unaware of her own needs for hygiene and health. Yen testified that because the bathroom facilities in K.H.'s home were unusable, it is possible K.H. was defecating outside the bathroom. Further, Yen testified that to the extent that there was food in K.H.'s home that was not spoiled, it was unclear whether it was being consumed by K.H. All those things, Yen stated, are necessary to keep ourselves safe, and K.H.'s inability to do them showed that her brain was incredibly disorganized to the point that she could not care for her most basic needs. Yen's testimony was not challenged on cross-examination.

Moreover, K.H.'s medical records showed evidence of slight hypoglycemia and a slight potassium deficiency. Yen stated that this could be an indication of K.H.'s inability to provide adequate nutrition for herself, which put her health at risk.

After K.H. was admitted into the hospital and up until the time of the 14-day commitment hearing, her psychiatric symptomatology remained unchanged. While at Fairfax, without access to illicit substances, K.H. suffered from hallucinations and presented as delusional and paranoid. Indeed, K.H. endorsed paranoid delusions of Fairfax selling her home and "making money by selling pills." K.H. also remained uncooperative, irritable, yelled and cursed at Fairfax staff, and on the morning of the 14-day commitment hearing she expressed a belief that her family would be attacked.

Substantial evidence supports the trial court's findings and conclusion that K.H. was "gravely disabled" under RCW 71.05.020(25)(a).

2

When the State proceeds under the definition of "gravely disabled" under RCW 71.05.020(25)(b), it must produce "recent proof of significant loss of cognitive or volitional control." LaBelle, 107 Wn.2d at 208. Additionally, there must be proof that the individual "is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." LaBelle, 107 Wn.2d at 208.

K.H. again asserts that the trial court relied too heavily on her home's condition in finding that she had deteriorated from her baseline level of functioning and argues that its poor condition was just as likely due to K.H.'s substance abuse and the presence of undesirable guests as it was because of her mental disorder. The State argues that the circumstances of K.H.'s deterioration in functioning, added to her continued psychiatric symptomatology while at the hospital, show that the decline from her baseline level of functioning was a function of an underlying behavioral health disorder rather than strict drug abuse. We agree with the State.

At the 14-day commitment hearing, Johnson's testimony showed that K.H. was not functioning at her baseline before getting admitted to the hospital. Johnson stated that the last time she knew K.H. was acting like herself was sometime in 2023, after a two-month stay at Navos Behavioral Health Hospital. After being released, K.H. stayed with Johnson for a little while, and the communication between the two was very good. K.H. respected the space Johnson allowed her to use and did not hoard. And Johnson testified that K.H. had been taking prescribed psychiatric medication on a regular basis, and that she was looking into productive activities such as enrolling in a community college.

Johnson continued her testimony by stating that the main difference between K.H.'s stable behavior in the past and now is that she stopped taking her medication, started hanging around certain people, and became increasingly isolated to the point where she stopped wanting to go to counseling sessions. Johnson stated that shortly before her commitment, K.H. lived in squalor, was unable to hold a coherent conversation, and was hoarding trash, clothes, food, random tools, and garbage in her home. Johnson also testified that right before taking her to the hospital, K.H. was sitting on her bed, in the middle of a mess, and that the bedroom was "filled with Clorox and ammonia."

Johnson also testified that in the weeks leading up to K.H.'s commitment, she tried to talk to K.H. about setting up online counseling through an app on K.H.'s phone, and about obtaining her medication, but K.H. refused to listen. Johnson stated that things had just "gotten worse and worse for [K.H.]"

Yen's testimony corroborated Johnson's. Yen testified that at baseline, K.H. is a productive, functional person. But when she does not take her medication—as was the case shortly before she was committed—her psychiatric symptoms escalate, and she engages in behavior that puts herself and others in danger. Yen added that K.H. appears to be able to recompensate well within a hospital structure, which would allow her to regain the ability to take care of her basic needs. But at that point in her treatment, Yen stated, they had not accomplished that.

Substantial evidence also supports the trial court's findings and conclusion that K.H. was "gravely disabled" under RCW 71.05.020(25)(b).

Because substantial evidence supports the court's conclusion that K.H. is gravely disabled under RCW 71.05.020(25)(a) and (b), we affirm.

_Mann, J._

WE CONCUR:

_Díaz, J._

_, ACJ_